## S. & T. RINGGOLD vs. M. RINGGOLD, et al.
## M. RINGGOLD, et al. vs. S. & T. RINGGOLD.—June 1826.

Trustees empowered by deed to sell real estate, and with the proceeds pay debts and make investments in stock, are not authorised to exchange the trust property for other real property. By making such exchange, though with the best intentions, they are responsible for the full value of the property parted with.

The policy of the law requires, that the relation of trustee, and *cestui que trust*, should be guarded with vigilance, and contracts between them scrutinized, that no injustice should be done the *cestui que trust*.

Where a *cestui que trust* has undertaken to indemnify his trustee, a court of equity ought to be satisfied that he was free to act, as a rational, intelligent man, not governed by considerations growing out of a dependant condition; otherwise the indemnities will be disregarded.

Where a trustee disposes of the title to lands, in violation of his duty, and the court has no other possible means of reinstating the *cestui que trust*, the trustee is responsible for the utmost value of the property disposed of; yet when the value of the property can be clearly ascertained, that must be the measure of the indemnity.

In the case of a mixture or confusion of property from necessity, the full value is given to the innocent party.

A sale by one trustee to his co-trustee, is illegal.

Where it was the duty of trustees to collect purchase money, and invest it, some of the trust estate being sold to T, a co-trustee, and S, another trustee, made no effort, at any period during the existence of the trust, to oblige his co-trustee to pay for his purchase, but suffered it to lie in the hands of T, when he, S, knew, that the trust was abused, in consequence of a failure on T's part to apply the amount of the purchase money according to the trust, they are both responsible.

Where S and T sold personal property, with the assent of its owner, took bonds from the purchasers in their own names, collected a part of the purchase money, proffered themselves ready to account for such sales, made a return thereof as trustees, a court of equity will infer some conventional arrangement between the parties, in the nature of a trust, which may be enforced in that court.

A court of equity must always decree upon the allegations in the bill of the complainant, and it is not justified in going beyond them. As where he relies upon trusts in certain deeds, and complains of a violation of those alone, though the facts admitted by the defendant disclose the existence of other trusts, for which they are responsible to the complainant; yet that court cannot decree for such other rights—they must be reserved for future consideration. In order, however, to do justice between the parties, where the trustees were bound to pay debts, the court will infer, in the absence of express proof, that the debts paid by them, after the receipt of money from the trusts not charged in the bill, were in fact paid out of such receipts.

Where one trustee purchases a part of the trust estate, for which he was to

pay at a stipulated period, and his co-trustee, under the circumstances, being jointly responsible with him for the principal, there is, of course, a joint responsibility for the interest.

Co-trustees are bound to know the receipts, and watch over the conduct of each other. Where one trustee received trust funds applicable to outstanding debts which he did not pay; nor did he keep such funds separated from the mass of his estate, a co-trustee, who from his situation must have known of such receipts, yet makes no effort to obtain them or have them applied, is jointly chargeable for interest with his associate.

Where trustees transcending their powers, make investments in unproductive property, they are chargeable with interest.

Where property is conveyed to trustees, to be sold for the payment of debts, and the surplus to be invested in stocks to produce interest, which interest is specifically appropriated by the terms of the conveyance; the proceeds of such estate being in hand, it was the imperative duty of the trustees, to have invested, unless a portion, or the whole, had been demanded by acknowledged debts; and where hopes were entertained by the trustees, that a claim, then depending in court, would be perpetually enjoined when it had been litigated for several years, and no reasonable expectation of a speedy close, they were not justified in laying by the money, and waiting the event of a protracted chancery suit. In such a case, the trustees were grossly negligent, and they must pay interest.

Compound interest will be allowed where a trustee is directed to invest funds, and to re-invest the dividends; or where the trust directs an accumulation, and the trustee has used the funds; yet the ground of this allowance is the actual or presumed gain of the trustee by the use of the funds. Where the circumstances forbid the presumption of gain by the trustee, it will not be allowed.

To trustees who have invested, or made efforts to invest, trust funds, a rest of six months on their receipts, without interest, will be allowed as a reasonable time within which to invest; but where they manifested no disposition to make such an application of their receipts, as the trust contemplated, no such rest is allowed.

It is a general rule, that an answer responsive to a bill, is evidence for the respondent; but the answer of a defendant, when it asserts a right affirmatively, in opposition to the plaintiff's demand, is not evidence.

An answer will not support a matter set up in avoidance, or discharge, where the matter of avoidance is a distinct fact; in such a case, the defence must be proved.

On a general bill to account, the answer is no evidence of disbursements; such a bill is nothing more than a demand on the defendant, to shew his receipts, and the legal sufficiency of his expenditures.

In all cases, where a complainant seeks a discovery and relief, and to make out his case, applies himself to the conscience of the defendant, if in his answer the liability is once admitted, there can be no escape from it, but by proof; though every thing which he says with regard to the creation of that liability, must be taken together.

By an equitable construction of, and by analogy to, the statutes of this state, allowing commissions to executors, guardians, and trustees, under judicial sales, commissions may be allowed to conventional trustees, though there was no agreement between the parties to that effect.

Where the chancellor's decree was entirely reformed in the appellate court, each party was decreed, in a case of cross appeals, to pay their own costs in that court.

The auditor's report may be excepted to in the appellate court, and the whole accounts gone into, whether general or special, or no exceptions had been taken to it in the court of chancery.

CROSS APPEALS from the Court of Chancery. In order that this case may be fully comprehended, we give the statements made of it by the Chancellor, and by the appellants' counsel, on the appeal by *S.* and *T. Ringgold.* The appellants' counsel stated that the original bill in this case was filed on the 29th of January 1811, by *Mary Ringgold,* wife of *Thomas Ringgold,* and the children of said *Thomas* and *Mary,* by *James Gittings* the elder, their next friend. It charges, 1st. That *Thomas Ringgold,* being seized of a considerable real and personal property in *Virginia* and *Maryland,* and being largely indebted, did on the 22d of October 1798, convey to *Samuel* and *Tench Ringgold,* the defendants, all his said real estate, in trust, to sell the same and pay his debts, and for other purposes. 2d. At the same time *Thomas* gave to his said trustees, authority to collect large sums of money due to him, and apply them in the same manner. They collected large sums, the amount thereof not ascertained, and they are required to render an account thereof. Shortly after the execution of said deed, and until the filing of the bill, *Thomas* and his wife have lived separately, and the wife and children have been supported by the father of the wife, *James Gittings.* 3d. The said *Thomas, Samuel* and *Tench,* seeing the justice of making provision for the wife and children of *Thomas,* which had been omitted in the first deed, and the wife being willing on these terms to relinquish her right of dower, a second deed to *Samuel* and *Tench* was executed on the 18th of December 1807, in which the wife relinquished her dower, and which conveyed to them all the real, and a large personal estate. In pursuance of said last deed, the trustees made sale, on or about the 2d of May 1808, of a large portion of the real and personal estate, and have received large sums of money, bonds, &c. A partial ac-

count thereof has been rendered to the complainants by *Samuel.* It is charged that there still remain unsold divers other tracts of land and personal estate. The complainants are informed that the trustees, or one of them, are or is largely indebted to *Thomas* for the proceeds of the estate of his brother *Benjamin,* which they contend ought to be set off against the sums paid by the trustees for *Thomas,* and pray that the amount of it may be set forth in the answer to the bill, and that it may be accounted for. It is charged that the trustees have not paid any part of the proceeds of sale to the complainants, nor have they invested it in any stock. Much of the money, with the bonds and notes, is in the hands of *Tench Ringgold,* who is out of the jurisdiction of the court. The bill then requires the defendants to answer the premises, and particularly what part of the property was sold, and for what price, and *that they render a particular account of their transactions under said deed of trust.* Whether they have not received large sums of money due to *Thomas Ringgold?* and if *yea, that they render* a particular account of each sum so received. Whether either of them was indebted to *Thomas; whether they have paid any of the debts due from* said *Thomas, and state the same?* If any yet due, to what amount, and to whom due? *Prayer,* that *Samuel* and *Tench* be compelled in all respects to execute the trust, and after paying the debts, to invest the balance for the benefit of the complainants. Also a prayer for general relief. The *complainants' exhibits.*—The deed of the 22d of October 1798 from *Thomas Ringgold* to *Samuel* and *Tench Ringgold,* of all his, *(Thomas')* houses, lands, lots and tenements, situate within *Maryland* and *Virginia,* in trust, to sell the same at public or private sale, for cash, or on credit, as they, or the survivor, may judge most expedient, and apply the proceeds to discharge the legacies directed in his father's will, to be paid by *Thomas.* 2d. To discharge all judgments at the time obtained against *Thomas,* with power to contest such as are not just. 3d. To secure and indemnify said trustees against all bonds entered into by them, or either of them, for *Thomas,* and all costs, fees to counsel, &c. incurred in virtue of this deed of trust. 4. To pay all other debts then due. 5. And as to the surplus, to permit *Thomas* to possess the real estate, and

receive the interest of the money, or have the same invest-
ed for his use, during his life, and after his death, his wife,
if she survives him, to enjoy one third part of the real, and
to receive one third of the interest of the money to her own
use, and the rest to be applied to such persons as *Thomas* by
his last will shall direct. If *Thomas* survive his wife, the
whole of it to be applied as directed by his last will. To this
deed there was no relinquishment of dower. Also the deed
of the 18th of December 1807, from *Thomas* to *Samuel*
and *Tench*, for all *Thomas's* land, in the counties of *Kent,*
*Queen-Anne's* and *Baltimore*, wherever situate, in the state of
*Maryland*, and all his negroes, stock, horses and plantation
untensils, in trust, to sell immediately the whole, and *after pay-*
*ing all the just debts of said Thomas*, to invest the proceeds,
*when received*, in bank stock, stock of the *U. S.* or turnpike
stock. 2d. To pay to the wife of *Thomas*, during their joint
lives, one-fifth part of the interest or dividends, as the same
may be received, for her sole use. 3d. One-half of the residue
of said dividends to the support and education of the children.
4th. All that remains to be paid to the grantor. 5th. If the
wife of the grantor survive him, she is to receive one-third,
and the rest to be applied to the support and education of the
children. (Further provision in case the grantor survived his
wife.) Finally, the whole capital to be transferred to such of
the children as *Thomas* shall by will direct, or if no will, to
go equally to the whole. To this deed there was the wife's
relinquishment of dower. Also the partial account of the trus-
tee, (*Exhibit* No. 3,) which it is stated in the bill was render-
ed by *Samuel* to the complainants. It purports to be an ac-
count of sales of land and negroes, stock and farming utensils,
sold by *S.* and *T. Ringgold, without date.* The *answer* of
*Samuel Ringgold*, filed the 12th of February 1814, admits
the deeds; that the defendants accepted of the trust, and sold
the property, with the exception of some parcels of land, which
are described, and which he states they had been unable to sell.
He exhibits accounts marked *S. R.* No. 1 to No. 4, which he
states contain a full exposition of his conduct as trustee. *In*
*these he has charged himself with all monies which came to*
*his hands as a trustee, and gives himself credit for all pay-*

*ments made by him*, and that there was due to him on the 13th of March 1813, the sum of $13,084 77. In these accounts he has not charged himself with $25,000 mentioned in the account rendered to the complainants, (their *Exhibit* No. 3,) as the price of land sold to *R. S. Thomas*. The said land was sold to *R. S. Thomas* for certain lots at *Havre-de-Grace*, and certain ferry rights on the *Susquehanna*, estimated at $18,000; and, secured by mortgage, $7,000, amounting together to $25,000. The said sale was considered at the time highly beneficial to *Thomas Ringgold*, and the complainants. *Thomas Ringgold*, before the exchange took place, was consulted, and advised it, and has since approved of it, as will appear by *Exhibit* No. 5, with *Thomas Ringgold's* certificate thereto, of the 30th of March 1813. The property received in exchange as aforesaid from *R. S. Thomas* was conveyed in fee simple to the trustees. The defendant has always considered the same to be held in trust for *Thomas* and his family. Last summer (1813) the ferry-house, a large and valuable brick building, was destroyed by the *British*. Since, the defendants have sold said property for $14,000, for which they are accountable to the complainants. Although in the account rendered (complainants' *Exhibit* No. 3,) the farm called *Hopewell* was estimated at $20,178, it was in reality worth only $16,000. It was put up at that sum, and was struck off at that bid, at the time of the sale; but in the exchange with *R. S. Thomas* it was estimated at the first sum. The answer next states judgments obtained by *John James Maund* against *Thomas Ringgold*, for the removal of which to the court of appeals, the defendant became security in the appeal bonds. If these claims should be sustained, they will greatly increase the balance due from *Thomas Ringgold* to the defendant. It is stated that the claims were believed to be fraudulent, and a bill for relief had been filed in chancery. There are other claims, but of the precise amount the defendant is not informed. *Exhibit S. R.* No. 6, is a list of lands, negroes and specifics, sold by the trustees, and the previous *Exhibits, S. R.* 1, 2, 3, 4, will show what part of the purchase money has been received by him. As to *Benj. Ringgold's* estate, the negroes and horses were divided among the representatives before the execution of the deed of trust;

the balance of the personal estate not sufficient to pay the debts of the deceased. The real estate of said *Benjamin* consisted of land in *Queen-Anne's*, (the interest of *Thomas* in which is a part of his real estate, not sold,) and a tract of land in *Washington* county, which *Thomas* himself sold to the other defendant, *Tench*. The answer also sets forth a legacy of £500, left by their mother to the defendants, in trust for *Thomas* and his family, and for which *Thomas* is credited in statement No. 4. The *answer* of *Tench Ringgold*, filed the 15th of July 1816, exhibits accounts, which show the monies received and paid by him—gives the statement that is given by the other defendant relative to the exchange of lands with *R. S. Thomas*; and states sundry expenses incurred by him, in order to give value to the ferry property received in the exchange. He refers to *exhibit* F, for showing the balance due from him to be $14,811 15. On the 6th of October 1818, the complainants filed a supplemental bill, and set forth the proceedings in the former suit. They charge, that agreeably to the provisions of the deed of 1798, the wife, in the event of her surviving the husband, was entitled to a certain interest, and the rest of the complainants to the balance of the trust property, in the event of *Thomas Ringgold* dying intestate; and that the deed of 1807 invested complainants with an immediate and certain interest, in certain proportion, in one half of said trust estate, during the life of *Thomas Ringgold*, and after his death, with a contingent interest in the whole proceeds. The complainants next charge, that *Thomas Ringgold* on the 28th of March, 1816, conveyed all his interest in said property to his two sons, *Thomas* and *James*, in trust, to provide for his comfortable maintenance, and for the support and education of all his children—and divide the principal among them as they should arrive at full age, and with authority to the grantees to compel the trustees to execute the trust. They have lately been surprised to hear, that *Thomas Ringgold*, who is stated to have died in 1818, had left a will, which the complainants exhibit, leaving to his daughter *Elizabeth* £500, on her arriving at 18, or her marriage; $500 to *Silence Kinsley*, and the rest to be equally divided among all the children, including *Elizabeth*. The executors renounced,

and letters of administration have been granted to the widow. The complainants are advised, that *Thomas Ringgold*, after the said deeds, had nothing to dispose of after his death. These facts having happened since the filing of the original bill, in order to bring the rights of all parties before the court, and to have a full settlement of said trust, it is necessary for complainants to file this their supplemental bill, which they pray may be accepted as such. They have reason to believe, that the defendants have, since filing the original bill, sold more of the trust property, and have received the purchase money, and other monies, for property sold previously. "which sums of money are no ways accounted for in the answers of said trustees to the said bill, or the accounts and exhibits therewith filed." There were various articles of property received by said defendants under the deeds of trusts, and various sums of money received by them before the filing of the original bill, which are not noticed, or any ways accounted for, in their answers, and the accounts and exhibits therewith filed. They mention nine negroes taken by *Samuel* at $2000; a negro woman and her two sons, worth $800, taken by *Tench;* also considerable sums of money received by them for rents of land in *Kent* and *Queen-Anne's* counties before the filing of the bill, for which no account is rendered. They conceive that they are entitled to demand the $25,000 for lands sold to *Richard S. Thomas*, and have nothing to do with the property and ferries, and ferry rights, bought from *R. S. Thomas;* yet if mistaken in this they have a right to demand an account of the rents and profits thereof. They call upon the defendants to answer the premises, and fully and particularly account for all their acts and doings; pay over all the monies, and assign to them all the trust property. The will of *Thomas Ringgold*, exhibited by the complainants—In it is the following clause: "Whereas I am fully sensible that my brothers, *Samuel Ringgold* and *Tench Ringgold*, have always considered my interest, and have done every thing in their power to advance my welfare, and that of my family, I do hereby fully, completely, and in the most ample manner, ratify and confirm all purchases and sales of whatever nature or kind, of my property, made by my said brothers, or either

of them, or both of them." The will is dated the 6th of July 1811, and was proved on the 20th of May 1818. *S. Ring-gold's* answer to the amended bill, was filed the 6th of October 1819. He admits the deed of *Thomas Ringgold* to his sons, and his will; that his widow was appointed administratrix; states some sales which have taken place of trust property; some of the money still due, the rest paid to the complainants. He denies that he had received any money not accounted for in his answer to the original bill. The negroes delivered to him at $2,000, were in part payment of a debt due to him from *Thomas Ringgold.* He accounted in his former answer for all rents and profits received by him. He leaves it to his co-trustee to render an account of the rents received by him, also of the negroes which he is charged to have received. The *answer* of *Tench Ringgold* to the supplemental bill, states that he has sold no property since filing his first answer. He denies the charge of having taken a negro woman and her children, the property of *Thomas Ringgold.* In answer to the charge of having received rents and profits of the ferry, he gives a particular account of the contract with *R. S. Thomas;* the approbation of it by the complainant *Mary,* as well as her husband; the situation of the ferry property; the expenses incurred by him in regard to it, &c. &c. An abstract of which, on account of its length, cannot here be given.

Commissions issued, and testimony taken thereunder; and by agreement of the parties, the auditor was directed to state the accounts. To the report and accounts of the auditor, both parties excepted upon various grounds. The case having been argued was submitted.

JOHNSON, Chancellor, (July Term, 1824.) On the 29th of January 1811, the original bill was filed, setting forth, that on the 22d of October 1798, *Thomas Ringgold,* the husband of *Mary,* and father of the other complainants, being largely indebted, executed a deed to the defendants for a large real and personal estate in *Maryland* and *Virginia,* in trust, to sell and pay his debts. *First.* The debts and legacies of his father's will. *Second.* All judgments at that time obtained, with the power of contesting such as were not considered fair. *Third.*

To indemnify the defendants as his sureties, and from all cost and fees to counsel, and expenses incurred under the deed. *Fourth.* To pay all other debts at that time due. *Fifth.* The surplus, consisting of real estate, bonds or money, in trust, to permit the grantor to hold and possess the real estate, and receive the interest of the money, or have it laid out and invested for his benefit, during life, to his own use and advantage; on his death, living the wife, she to have one-third of the real estate, and to receive the interest of one-third of the money during her life, in lieu of dower. *Sixth.* The other two-thirds to be conveyed and applied to such persons as *Thomas Ringgold,* by his will, shall direct. *Seventh.* If he survived his wife, then the whole to be conveyed and applied according to his will; and *Eighth.* If he died intestate, then to his heirs and representatives. To this deed Mrs. *Ringgold* was not a party, nor did she release her right of dower. The trustees, as the bill declares, were also authorised to receive the debts due to the grantor, and they did receive them to a large amount. Shortly after the deed, *Thomas Ringgold,* and wife, by mutual consent, agreed to live separate, and remained so when the bill was filed, and she, and the children, as is stated in the bill, lived with and were supported, and the children educated by her father, *James Gittings.* *Thomas, Samuel,* and *Tench Ringgold,* in order to make provision for the wife and children, and she, on the terms of such provision, agreeing to release her dower, another deed, on the 18th of December 1807, was executed, by which *Thomas* conveyed to *Samuel* and *Tench* all the lands and real estate of *Thomas,* lying in the counties of *Kent, Queen-Anne's* and *Baltimore,* wherever situated in *Maryland,* with all his negroes, stock, horses and plantation utensils, in trust, immediately to sell the whole at public or private sale for the best price, and after paying all debts, to invest the proceeds, when received, in bank stock, or in stock of the *United States,* or turnpike stock, as shall be most beneficial. *Second.* To pay to the wife, for her sole and separate use, during the joint lives of husband and wife, one-fifth of the interest or dividend yearly, or half yearly, as the same may be received. *Third.* To pay and apply one-half of the residue to the support and education of the children, yearly or half yearly. *Fourth.* To pay the whole

residue to *Thomas*; and in the event of the wife's surviving, then, *Fifth*. She is have one-third, in lieu of the one-fifth. *Sixth*. The other two-thirds to support and educate the children; and if *Thomas* survived, *Seventh*. Then one-fifth given to the wife to go to him. *Eighth*. Till the proceeds of the sale are invested, the interest to be paid and applied as received, in the same proportions and manner to the same persons. *Ninth*. To transfer and assign the whole capital, whether in stocks or debts, to such of their children as *Thomas* by will shall direct, subject to the previous trusts; and if he died intestate, then the whole capital to be equally divided amongst their children, subject to the previous trusts. This deed was signed by the wife, as well as by *Thomas, Samuel,* and *Tench Ringgold;* and she formally released her dower. In virtue of this deed, as the bill declares, the trustees, on or about the 2d of May 1808, sold a large portion of the real and personal estate, received divers sums of money, bonds, notes and mortgages, of which a partial account was rendered by *Samuel;* that there remained unsold other lands and personal property. That the trustees, or one of them, is largely indebted for the proceeds of the estate of *Benjamin Ringgold,* deceased, which the bill claims to be set off against what the trustees may have paid for *Thomas.* No part of the proceeds of sale have been invested, and the greater part of the money, bonds, and other securities, the bill declares, are in the hands of *Tench Ringgold,* residing in the District of *Columbia.* The amount of sales, according to the account rendered by *Samuel,* a copy of which, *Exhibit* No. 3, is filed with the bill, is $48,886 90. In this account, a tract of land called *Hopewell,* with certain other property specified, is stated to have been sold to *Richard S. Thomas* for $25,000. A memorandum appears at the foot of the account as follows, to wit: "The ferries at *Susquehanna* we have taken from Mr. *Thomas* at $18,000. The deed is given to *S.* and *T. Ringgold,* as they had no right under the deeds of trust to invest the monies in lands, and *S.* and *T. Ringgold* are answerable for that amount. They mean to sell them as soon as they can to advantage, which shall accrue for the benefit of *Thomas Ringgold,* Mrs. *Ringgold,* and the children." The original account, of which *Exhibit* No. 3 is a copy, distinguish-

ed by *Exhibit* B, is in the handwriting of *Samuel Ringgold*. *Samuel Ringgold*, in his answer filed on the 12th of February 1814, admits the trust deeds, and the sale of the real and personal estate for the purposes specified, except part of the real estate of *Benjamin Ringgold* in *Queen-Anne's*, and about 60 acres in *Kent* county, which they have not been able to sell. His accounts, exhibited with his answer, *S. R.* No. 1, to *S. R.* No. 4, contain a full statement of his conduct as trustee. In those statements he has charged himself with all monies that have come to his hands, and credited himself with payments and disbursements, and there was due to him on the 13th of March 1813, $13,084 77. In these statements the respondent says he has not charged himself with the sale of the property estimated in the account rendered by him to the complainants, of $25,000, for land sold to *R. S. Thomas*, for lots and land at *Havre-de-Grace*, with ferries and ferry rights on *Susquehanna* river, in which account *Hopewell* was valued at $18,000. Before the sale or exchange *Thomas Ringgold* was consulted, and he approved the measure, and it was deemed a beneficial transaction. *R. S. Thomas* conveyed to *S.* and *T. Ringgold*, and that he, *(Samuel,)* always considered himself a trustee for *Thomas Ringgold* and family. The last summer, the answer states, that the ferry-house, a large and valuable building, was destroyed by the *British*, and since then the trustees have sold the property for $14,000, for which they are accountable. And although in the account rendered by the respondent, *Hopewell* is estimated at $20,178, yet he alleges it was only worth $16,000, the sum it was put up for at the public sale, and struck off at the trustees' bid. In the negotiation with *R. S. Thomas* it was estimated at $20,178 by which the trustees made $4,178 for the complainants. That exclusive of the $13,084 due to the respondent, he has made himself answerable for a large sum on account of a judgment obtained by one *Maund*, use of *Ricketts* and *Newton*. Suits were brought on the appeal bonds, executed on the removal of the original judgment to the court of appeals, and judgments obtained, and if compelled to pay, the balance due him will be proportionably increased. The claim, *(Maund's)* was thought unjust, and therefore contested. The answer denies that the complainants have been

entirely maintained by Mr. *Gittings,* for the respondent paid two thousand dollars. *Samuel Ringgold* administered on *Benjamin Ringgold's* estate, and the negroes, and some other property, were divided between the representatives before the deed of trust, not leaving enough to pay the debts. The part of the real estate in *Washington* county of *Benjamin's,* that *Thomas* was entitled to, he sold to *Tench. Tench* in his answer states in substance, so far as relates to *Hopewell,* and the ferries, the same facts as in *Samuel's* answer. In the original answer of *Tench* no vouchers were filed; exceptions were taken, which were sustained; and on the 15th of July 1816, an amended answer was filed, accompanied with certain vouchers. *Thomas Ringgold* having died on the 6th of October 1818, a supplemental bill appears, setting forth, that on the 28th of March 1816, *Thomas Ringgold* transferred to his two sons *Thomas* and *James,* all his interest in the trust property, in trust, out of the interest and dividends, to provide for the father's comfortable maintenance, for the support and education of his two sons and their brothers and sisters, during their minority, and to divide the principal and interest equally between them, their brothers and sisters, as they respectively arrived at age, and authorised the grantees to compel a settlement with the defendants. *Thomas Ringgold,* on the 6th of July 1811, made a will, and after certain bequests devised the residue of his estate equally amongst his children—the executors renounced, when letters of administration were obtained by *Mary* his widow. Since the original bill, the supplemental bill charges, that the trustees have sold more of the trust property, and received more money, and in the answers to the original bill they did not account for all they had received, particularly nine negroes taken by *S*amuel at $2000, and that they have not accounted for rents received. In the supplemental bill it is alleged, that the deed of trust to the sons being subsequent to the will, revoked it. *Samuel,* in his answer to the last bill, denies that any of the trust funds were sold, except some lands in *Kent,* for which suits were depending to recover the purchase money; and except another small piece, the purchase money for which was received by *James G. Ringgold,* one of the complainants. Admits the delivery of

the negroes to him at $2000. On the 13th of July 1820, with the consent of the parties, an interlocutory decree was made, directing the auditor "to state an account upon the evidence already taken, and upon such other evidence as shall be produced before him by either of the parties. That the auditor shall state accounts according to the instructions of each of the parties, and that all equity, as to the rights of the parties, be reserved until final hearing." After taking, in virtue of the decree, a variety of evidence, and with the mutual admissions of the correctness of various items against the defendants, and of sundry disbursements in their favour, on the 6th July 1822, his report was made, containing several accounts in pursuance of the complainants' instructions—One of the defendant's, and a third in conformity with the auditor's own judgment. From the voluminous papers and documents, the variety of evidence, and the extensiveness of the transaction, much labour and attention are indispensable for a correct decision of this cause; but the well arranged view of the subject taken by the auditor in his report and accounts, greatly contributes to relieve the court. In making his report he has distinguished those disbursements which are admitted, from those not admitted, or disputed, or reserved for his further consideration. Those statements he has distinguished by Nos. 1 and 2. From the evidence and vouchers admitted, the defendants' receipts are stated before and to the time of the second deed of trust of the 18th of December 1807, distinguishing them by their respective sources, and classing them accordingly in separate statements marked A, B, C, and D. From those materials an account current between each of the trustees is stated to the date of the second deed, charging and crediting each with his own receipts, and admitted disbursements, and with interest, showing the balance then due to or from either The interest is charged from the end of six months after the date of the receipt. These accounts are numbered 1 and 2, From the evidence referred to, *statement E* is made to show the several sums which the trustees were chargeable for on account of sales of the trust estate, by them made about the close of the year 1807, and afterwards. This statement, as the auditor most correctly observes, makes an important part of every subsequent account; and in regard to

the sale of *Hopewell*, and the ferries, taken in exchange, is controverted by both parties.

In the *statement* E, the defendants are charged with the sum of $16,320, on account of the sale of *Hopewell*, when according to *exhibit* B, (the list of sales furnished by the trustees,) that tract is charged as having been sold for $20,178. The sale of this tract of land presents one of the important subjects of controversy. To present the subject matter of controversy in a clear light, the auditor has returned with his report several accounts predicated on different principles—the *account* No. 4 leaves a balance against the defendants of $46,963 92, this is the account formed according to the auditor's judgment. *Account* No. 5, grounded on the complainants' instructions, makes a balance in their favour of $74,463 23; and *account* No. 6, founded on the defendants' instructions, makes the balance only $21,900 39. Exceptions have been taken by the complainants and defendants, each excepting to all the accounts that are inconsistent with the accounts they claim as correct; in other words, the complainants insist on *account* No. 5, and the defendants on *account* No. 6. The case has been fully and elaborately argued, since then that attention has been bestowed on the cause which its magnitude and importance demanded.

The first subject of inquiry is to what extent are the defendants responsible on account of the sale or exchange of the tract of land called *Hopewell?*

Trustees, who faithfully and diligently discharge the duties they take on themselves to perform, can never sustain loss; they are only liable for what they duly receive in the performance of the trust; and acting *bona fide* within trust limits, should an injudicious sale of the trust funds be made, yet no responsibility attaches to them, they can only be called on to account for the amount actually received. But when the trustee transcends his limits, when the funds confided to his limited superintendance are applied to objects foreign from the trusts, then he becomes responsible for the utmost value of the funds thus misapplied. *Lupton vs. White*, 15 *Ves.* 432. The *Attorney General vs. Fullerton*, 2 *Ves. & Beam.* 265. *Hart vs. Ten Eyck*, 2 *Johns. Ch. Rep.* 108, 116.

The deeds, under which the trustees acted, cannot be considered as authorising them to exchange the land for other land. The object of the deeds was to raise money to meet pressing demands to discharge the debts *Thomas Ringgold* was responsible for, to indemnify his sureties, and to invest the surplus as prescribed for the benefit of the respective persons mentioned in the deed, and to the extent as herein provided. Of the limited powers conferred by the deeds, the trustees were perfectly aware, and therefore, in the account of sales rendered by *S. Ringgold,* he remarked, "The ferries at *Susquehanna* we have taken from Mr. *Thomas* at $18,000. The deed is given to *S.* and *T. Ringgold,* as they had no right, under the deeds of trust, to invest the monies in lands, and *S.* and *T. Ringgold* are answerable for that amount." If trustees, misapplying the trust funds, are responsible for the utmost value, and as the tract of land called *Hopewell* has been parted with by them to an object foreign from the trust, it would appear, that the only subject of inquiry, in regard to the extent of the trustee's responsibility on that account, is the value of the land.

When the tract was exposed to public sale, it appears by the evidence it was struck off at $16 per acre, the price it was set up at. That afterwards they agreed to sell it to *R. S. Thomas* for that price, which ultimately he refused, when the exchange was accomplished, in which *Hopewell* was estimated at $20,178. If a trustee diverts the funds, by applying them to objects foreign from the trust, the *cestui que trust* has a right, either to receive that which the trustees obtained, or to make the trustee answerable for the full value of that which he parted with. The *cestui que trusts* in the present cause, if competent to act, could have elected to take the ferries in lieu of *Hopewell,* but they were not bound to do so; and as they claim the real value of *Hopewell* in 1807, when it was exchanged, they are entitled to receive it. On the part of the defendants no evidence is produced, except, that when exposed at public sale, it was struck off at $16 an acre, and that *R. S. Thomas,* after agreeing to give that price, refused to comply. Three witnesses are produced on the complainants' side, viz. *G. W. Thomas, William Barroll* and *Thomas Worrell,* all of whom concur, that the land exchanged was worth $25,000; they do not designate

the value of each part, but in the aggregate fix the value to be that which the trustees had placed on it in making the exchange. *Wm. Pearce* makes *Hopewell* to be worth $20 an acre, which is $222 more than it was valued at.

I am not apprised of any case being determined on which the value of funds, misapplied by trustees, have been come at by fixing on the amount they offered them at; the establishing such a principle might be productive of the most serious consequences, and prove highly detrimental to the interest of the *cestui que trusts;* but if in any instance it might be resorted to, surely not where the trustees had fixed *subsequently* on an enhanced value, and when that was, by disinterested witnesses, confirmed as the real value. The defendants are therefore to be charged with *Hopewell*, at the price attached to it at the time of the exchange. The trust in this cause was undertaken from the best of motives, attended with great expense, and considerable inconvenience to the trustees; they must sustain a loss; the unfortunate result of the exchange; the consequent destruction of the property on the ferry establishments, all fall on them, although the trusts reposed did not justify the ruinous transactions, all flowing from that exchange. Yet I feel fully assured the trustees acted from, and were governed by, the purest of motives, to wit, to extricate their brother, and provide for his family. And although principles, too powerful to be resisted, call on the court to cast those losses on them, yet so far as the just power of the court extends, they should be protected.

In the statement of the accounts by the auditor, he has allowed to the trustees a commission. It is true the *British* authorities refused to trustees commissions *eo nomine,* and yet they allow a compensation for the time employed in the performance of the trust, under the appellation of a *per diem.* But in this state the *per diem* has, if it ever existed, long since been abandoned, and the compensation is made by way of commission. To the *cestui que trust* the name of the compensation is of no moment; and to permit a *per diem* to be the governing rule, would be for the trustees to fix on the amount of the compensation, or the court must reject that part of the report stating the time they were engaged, and resort to some other standard, difficult to be fixed on. The defendants are

therefore to be allowed the commissions according to the principles of the report.

The auditor has given credit to the defendants for several sums alleged to be paid by them, in the performance of the trust, to support which no other voucher exists except the accounts rendered by the defendants in their answers to the original and supplemental bills. In the case of *Hart vs. Ten Eyck*, 2 *Johns. Ch. Rep.* 87, the law on this subject came under the consideration of Chancellor *Kent*. There are all the items in the account of *Van Rensselaer* (one of the defendants,) unsupported by evidence, and resting alone on the answer, were not correctly rejected. The bill was against him, and others, for an account as administrators, and charging them with various acts of fraud. *Van Rensselaer* in his answer, sets up certain claims against the testator himself, and those were attempted to be supported by his answer alone. After examining the claims specified in the account, and remarking on each, the chancellor reviews the law generally, and comes to the conclusion—"That those charges in the account, which are without proof, are inadmissible, and cannot be upheld by the answer, is a proposition which I consider to be as settled in law as it is in reason."

In the course of the discussion, a distinction is taken between reading an answer either at law or in chancery, when it is introduced as evidence, and the effect of the answer, in the very case under consideration, and before the court for its decision, when that answer was put in issue. In the first it seems conceded, if part of the answer is read, the other party has a right to read the whole as evidence—not so when the answer is put in issue. It seems to me, that the law is most clearly established, that when the defendant in chancery admits a charge against him, and desires to remove it by the statement of a distinct fact, by way of avoidance, and the answer is put in issue, the proof of the matter of avoidance is on him. But the nature, or the precise meaning, of the word avoidance, does not so clearly appear. And all the cases which have presented themselves to my view, are of the representatives of deceased persons, as executors or administrators, when called on to account, setting up claims against the deceased, not for expenses incurred in the performance of their trusts,

The case before Lord Chancellor *Cowper*, as reported in *Gilbert's Law of Evidence*, 45, was a bill by creditors against an executor for an account of the personal estate. The executor stated in his answer, that the testator left £1,100 in his hands. Afterwards, on a settlement with the testator, he the executor gave his bond for £1,000; and the other hundred pounds was given by the testator for his care and trouble. It was urged, in behalf of the executor, that having charged himself, and no testimony appearing, he ought to find credit where he swore in his own discharge. But it was resolved by the court, that when an answer was put in issue, what was confessed and admitted by it need not be proved, but that the defendant must make out, by proof, what was insisted on by way of avoidance. There is an obscurity in the report of this case. As no one can be heir to a living person, so no man alive can have an executor, (unless in old times, when he might be *civiliter mortuus*;) and therefore, a testator could never give to his executor £100 out of $1100 he had left with him, and take his bond for the balance.

If the defendant in his answer admits the receipt of money, but in the same sentence says he paid it away, the disbursement claimed needs no other proof; but if in one sentence the receipt is admitted, and in another the payment alleged, it must be proved otherwise than by the answer. *Kirkpatrick vs. Love*, *Amb.* 589. *Blount vs. Burrow*, 4 *Bro. Ch. Rep.* 74. *Hart vs. Ten Eyck*, 2 *Johns. Ch. Rep.* 87, &c. And these rules are said to be similar to those which govern in a court of law. But I am not aware that such principles prevail at law. It is very true, that when proof is obtained at law, that the defendant at one time admitted he received money from or of the plaintiff, he shall not free himself from the effect of that admission, by declaring at a different time he restored it to him, or applied it for his use. A court takes the whole conversations or declarations made at the same time, and does not limit its effect to this or that sentence. If at law the plaintiff uses as evidence the defendant's account to charge him, he is entitled to read the residue to discharge him, and is not confined to such as may be connected with the same sentence. The same, if the letters of the defendant are read in part by the plaintiff to charge, the

residue may be resorted to, to exonerate from the claim; and notwithstanding the high names maintaining the justice of the rule, that what is admitted in the answer, cannot be defeated by the answer when put in issue, I must confess the justice of the rule is not so clear to my mind.    But the rule is not only said to be just, but a contrary doctrine would be pernicious, and render it absolutely dangerous to employ the jurisdiction of this court, inasmuch as it would enable a defendant to defeat the plaintiff's just demands by the testimony of his own oath, setting up a discharge or matter in avoidance.    *Hart vs. Ten Eyck,* 2 *Johns. Ch. Rep.* 90.    It appears to me more just, that if the complainant relies on the defendant's answer to maintain his claim, that he should take that answer entire; that the whole, as it would at law, should be before the court, with the powers of believing such parts, and no more than was believed to be true.    The rule is too technical for a court of equity, which excludes the defendant from the beneficial parts of his answer, while his adversary is suffered to avail himself of those parts in his favour.    A court of equity forces a defendant to disclose the whole transactions, and in the instances of executors and trustees, forces them to render an account, not only of their receipts, but disbursements; and it would seem but just, that at least the attention of the court should be called to those statements made in compliance with its mandate, and not to have its eyes closed, and its understanding arrested, by being told the answer is at issue, and therefore the complainant may seize on admissions in his favour, and exclude the defendant from simultaneous statements; for let it be remembered, the whole answer is presented to the court at the same time.

The case now before me is not perfectly similar to those referred to in the opinion of Chancellor *Kent.*  Here, the defendants for many years acting as trustees in the settlement of a complicated estate, were authorised to pay debts, provide for the support of the *cestui que trusts,* and having entered on the trusts, after a considerable time are called on for a settlement. No imputation or charge of fraud is made against them; they are called to render a particular account of their transactions by the original bill, and by the supplemental bill; that they fully

and particularly account for all their acts and doings. The accounts and the correctness of them to a very great extent, at least, by the admissions of the complainants, are just. If it would be absolutely dangerous to employ the jurisdiction of the court, inasmuch as it would enable a defendant to defeat the plaintiff's just demands by the testimony of his own oath, setting up a discharge or matter of avoidance, may not the same be said on the other side, that it is absolutely dangerous to a defendant to call upon him for an account of his transactions as trustee, then to sift from his answer every thing to charge him, and turn him over to seek for proof of his own disbursements, great part of which cannot be obtained, owing to the confidence between him and the *cestui que trusts.* But the dangers on the part of the plaintiff and of the defendant are removed, by permitting the whole answer, if any part is relied on, to go before the court, with liberty to reject such parts as are not believed to be true. And believing, from the whole of the transactions, that all the disbursements allowed by the auditor, except that relating to *Hopewell,* are true, they are allowed, and the exceptions of the complainants on that subject overruled.

On the subject of interest I shall not attempt to review the numerous authorities produced at the argument, but content myself by observing the interest has been charged in conformity with the usual practice in this state. When trustees are directed to invest money, and fail to do it, they are liable to be charged with compound interest, unless some sufficient reason exists to free them. But that applies to cases of plain trusts, where the duty is obvious, and the means of performance clearly *within* their reach. In this case, from the whole of the evidence, it is difficult to fix on any period that the trustees had money in hand to be invested. The receipts by them, and the expenditures, are so blended together that the rule usually adopted in the interchange of dealings between merchants of interest accounts, appears the most judicious, and the allowance of the six months to pay away or invest before the trustees should be charged with interest, appears not unjust. The interest, therefore, allowed by the auditor to them, as well as that with which they are charged, is allowed.

RINGGOLD v. RINGGOLD.—1826.

It is difficult in this cause to divide the mutual responsibility of the defendants to the complainants; the funds confided to them have in part been so blended with their own affair; and the defendant, *Samuel*, having permitted *Tench* to receive so large a part of the money, when the former was in advance. By the *cestui que trust* the confidence was reposed in both of the trustees, one had no right to suffer the funds to remain unemployed in the hands of the other, especially when he had left the state, and was beyond the jurisdiction of the court. The acceptance of the trust, to use the language of Chancellor *Hardwicke*, obliged them to execute it with fidelity and reasonable diligence. 2 *Atk.* 406. And although I am perfectly satisfied it never was the intention of either of the trustees to conduct themselves so as to produce loss to the *cestui que trusts*, yet by dividing the responsibility, and making each only liable for what he received, I apprehend would cast a heavy loss on them. My opinion is, that each is liable to the complainants for the whole sum due them.

In respect to *Thomas Ringgold's* sanctioning accounts, and to his approval of the exchange of *Hopewell*, it can have no effect; after the deeds of trust were executed, he alone could not control or direct their objects. In regard to the accounts, I am perfectly assured he did not know whether they were just or not; but when his condition is taken into view, united with the cautious manner the court views the transactions between the trustee and the *cestui que trusts*, it appears to me that no tribunal ought to say that his confirmation of those accounts should free the defendant, *Samuel Ringgold*, from accounting in this court. In order, therefore, that the opinion expressed should be carried into effect, the auditor is directed to state an account pursuant thereto. The accounts, when stated, not to be subject to exception.

The auditor, in conformity to the above decretal order, stated an additional account, making a balance due from the defendants to the complainants, of $53,857 79, with interest on $39,480 46, part thereof, from the 1st of July 1822, until paid.

BLAND, Chancellor, (December term 1824.) The chancellor having considered the decretal order pronounced in this

cause on the twenty-sixth day of July, in the year eighteen hundred and twenty-four, as well as the report of the auditor of this court of the account between the parties, which has been stated conformably to said order, and exhibited in this court on the twenty-seventh day of September in the year aforesaid—*Decreed,* That the report of the auditor be confirmed, and that the defendants, *Samuel Ringgold* and *Tench Ringgold* shall, on or before the first day of December next, pay to the complainants, or bring into this court to be paid to them, the sum of fifty-three thousand eight hundred and fifty-seven dollars and seventy-nine cents, together with interest on thirty-nine thousand four hundred and eighty dollars and forty-six cents, part of the first mentioned sum, from the first day of July, in the year eighteen hundred and twenty-two, and the costs incurred by the said complainants in this court.

From which decree both parties appealed to this court.

The cross appeals were argued separately, before BUCHANAN, Ch J. and EARLE, ARCHER and DORSEY, J. but as the court in their decree consolidated the cases, one report only will be made, embracing the points argued in both.

In the argument of the two appeals the *four* first points were raised by the appellants' counsel, on the *first* appeal, as to the law arising thereon, and the remaining points by the appellants' counsel on the *second.* We number them in succession for the purposes of this report.

1. The appellants *(S.* and *T. R.)* ought not to be charged on account of the *Hopewell* estate with more than they received for the same; or if so charged, they are entitled to the full benefit of the bond of indemnity.

2. *Samuel Ringgold* is not responsible for the trust fund which came to the hands of *Tench Ringgold,* his co-trustee.

3. The charges of interest against *S.* and *T. Ringgold* are objected to.

4. The trustees were entitled to more commission than was allowed to them by the decree of the Chancellor.

5. The answers of the defendants are not *per se,* any evidence for them; but they are bound to sustain all their disbursements (except those which come under the head *de mini-*

*mis,)* by proof, as much so as the complainants are bound to offer proof of the amount of trust property which came into their hands.

6. *Interest* is to be charged on all receipts from their *dates*, as the trustees never invested, and never *intended* to invest. If a rest of *six months* be allowed, they are then chargeable with *compound* interest, or interest on the *annual balance* of *principal and interest.*

· 7. No provision having been made for allowing to the trustees any compensation or reward for their trouble, this court is not competent to make any such allowance.

8. *Tench Ringgold* is not a competent witness on behalf of *Samuel,* his co-trustee, as he swears directly to relieve himself from responsibility in regard to the *Mc Mechen* transaction, &c.

*Wirt,* (Attorney General of *U. S.) Jones, Taney* and *Magruder,* for the appellants in the *first* appeal, on the *first, second, third* and *fourth* points.

1. On the *first* point—As to the charge on account of the *Hopewell* estate. The sale of it as expressly proved, was made before the deed of November 1807. It was authorised by the deed of 1798, which gave to the trustees the only authority they possessed at the time of the sale to *R. S. Thomas.* The deed of 1798, it must be admitted, did not authorise the trustees to take other land in part payment of the purchase money. On the other hand, it cannot be denied that the contract, if it had been authorised by the deed of trust, would have been a judicious one, and beneficial to *T. Ringgold's* estate. In examining this question we must inquire what was the value of each tract at the time of the contract, and before the ferry property was destroyed by the *British.* The latter was then of great value and every day becoming more valuable, owing to the increase of travelling between the east and south. At the time of the sale it rented for $2,000 *per annum.* What was the value of the *Hopewell* estate? It never rented for more than $1,000 with all the negroes and stock and utensils upon it. With these facts, some estimate may be formed of the *Hopewell* landed estate; and when, moreover, it appeared that the tenants who gave that rent did not find it a good bargain. The deed of trust authorised a sale of the

*Hopewell* farm, and one of the purposes for which that deed was executed (the payment of judgments to a large amount against *T. Ringgold*) imperiously required that funds be raised though by a forced sale. The land was advertised to be sold at public sale—general notice was given—a numerous assemblage of people drawn to it, and among them all, those in the county, who, according to the proof, were likely to be disposed or able to buy. The sale failed—nobody offered even $16 per acre. Afterwards, however, *R. S. Thomas* agreed to give for it that price, and the contract was made with the entire consent of *T. Ringgold*, who was present, and without opposition from any quarter. The land being now, as was rightfully supposed, disposed of, it became necessary to make disposition of the negroes, stock, &c. on the farm, as their master *T. Ringgold* could no longer employ them. With his consent (without it they could not have been disposed of, as the deed of 1798 did not convey personal property, and the deed of 1807 was not yet executed, if thought of) all the slaves, &c. were disposed of. It must be borne in mind that according to the proof, in order to rent the farm well, it was necessary for the owner to supply the slaves and stock which it required. After all the personal property had been disposed of, *R. S. Thomas* refused to take the land. What then was the situation of the trust property? Judgments to a vast amount, and each of them a lien upon the property. The judgments of *Maund*, which are of so much importance in this cause, bound the land; and although an injunction had been obtained, yet that injunction might at any time have been dissolved, and the trustees, being securities in the appeal bond, would be bound to pay the money. It is in this, most embarrassing state of things, that the trustees are called upon to listen to the second proposition of *R. S. Thomas.* And what is that proposition made by a man who had been importuned to take, and refused to take this land at $16 per acre? To agree to take the land valued at $25,000, provided only that the trustees would take in part payment the ferry property, to be valued at $18,000, and he to secure the payment of $7,000, the balance of the purchase money, and *the interest of which is almost equal to the rent of the Hopewell farm,* after de-

ducting from the highest sum for which it ever did rent, only legal interest upon the proceeds of the sale of the personal estate, which the tenant took with the land.   The trustees are called upon to accept of, or refuse the offer.   They do not act hastily. *T. Ringgold*, the only person, except the creditors, who had a right to object, approves of it, and has again and again sanctioned it.  One of the defendants in his answer states, that *T. Ringgold's* wife, whose consent was not at all necessary, also approved of it.   The sale, and the terms of sale, were sanctioned by the man who had a right to object; and never objected to by any human being, until the filing of what is called the supplemental bill in this cause; *and not* disaffirmed in that, even if the complainants had any right to object to it.   Reliance may be had on the partial account exhibited by the complainants, and which they say was rendered to them by *S. Ringgold.*   This *partial* account is a particular account of all the property which came to the hands of the defendants, in which any part of the family of *T. Ringgold* had any interest.   It includes not merely the property which was conveyed to them by the deed of 1807, and in which the complainants, at the time of the filing their bill, had any interest, but also the property disposed of by them under the deed of 1798, in which the complainants, in the character in which they originally sued, had no interest.   It contains also the legacy of Mrs. *Mary Ringgold*, of a debt due to her from *S. Ringgold*, a debt due from *Tench Ringgold*, and *also the personal property on the Huntingfield estate*, which she left to the defendants, in trust for such of the children of *T. Ringgold* as they might select, and with the express condition that no part of it should be answerable for his debts.   And yet it is contended, that this very property, thus bequeathed by Mrs. *Ringgold*, ought to be considered a part of the trust property held under the deeds; and ought to be considered a part of the funds for the payment of *T. Ringgold's* debts—that these trustees ought to violate the trust created by Mrs. *Ringgold* for the benefit of the complainants.   But *S. Ringgold* offered to take the ferry property at its valuation, if the family of *T. Ringgold* objected to the arrangement.   In the first place *S. Ringgold* could make no offer by which the co-trustee could be bound.   But if he could, when did *T. Ring-*

*gold*, or any member of his family, object to the contract with *R. S. Thomas*, or allow them to treat the ferry property as their own? Subsequent events, not to be foreseen in 1807— the war with *Great Britain*, the famous exploit of Admiral *Cockburn*, and destruction of the houses at the ferry, greatly lessened the value of this property, and might have furnished a *cestui que trust*, with a reason for disaffirming this contract. But it would then have been too late, even if then, which is not the fact, any person had immediately objected to the con- tract. We need not, however, rest upon the circumstance, that the offer of *S. Ringgold* was conditional. What if there was uncontradicted proof, that both of the defendants intended, at the time the contract was made with *R. S. Thomas*, to take the deed for this property to themselves, and to hold it as their own? By the terms of the contract it was to be paid for with *trust funds*. The consideration of it was a part of the pro- ceeds of sale of the *Hopewell* farm; and although the defendants had determined to make this a part of their own private estate, and to charge themselves with the whole sum for which *Hope- well* sold, yet equity says, that even in that case it shall rest with the *cestui que trust*, whether it shall be the private pro- perty of the trustees, or a part of the trust estate. And *T. Ringgold*, the *cestui que trust*, has always claimed it to be a part of the trust fund, and insisted that the trustees should not charge themselves with the price at which *Hopewell* sold, and take to themselves this property. This, it is in proof, he had decided to do, before the deed of 1807. No matter then what was the intention of the trustees; it depended not upon their intention, but upon the sovereign will of the *cestui que trust*, if declared within a reasonable time, whether this should be the private property of the trustees, or a part of the trust fund; and it being in proof, that *T. Ringgold* immediately (before the complainants had any interest in the estate,) at the very time the contract was made, claimed it, and said it should be con- sidered as part of the trust estate, the trustees could not claim it, but held it in trust; and so holding it, it passed by the deed of 1807, which was but a new declaration of trusts, and which alone could give the complainants originally, a standing in the court of chancery. Assuming then that the deed of 1798

did not authorise the contract with *R. S. Thomas*, it is con-- tended, that it is now too late to impeach it.    It is no breach of trust, if the trustee acts with the *cestui que trust*, or he acquiesces.  *2 Com. Dig.* tit. *Chancery*, (4 W. 32,) 722.  *Lang- ford vs. Gascoyne*, 11 *Ves.* 333, 335.    *Parkes vs. White, Ib.* 225.    *Newl. on Cont.* 467.    *Trafford vs. Boehm*, 3 *Atk.* 444. *Brice vs. Stokes*, 11 *Ves.* 324.    *Fellows vs. Mitchell & Owen*, 1 *P. Wms.* 81.    It cannot be impeached in this suit, because *R. S. Thomas* is no party.    He had notice of the trust, and the deed to him referred to the deeds which gave the trustees the right to sell.    If a purchaser has knowledge of the · trust deed under which he purchases, he becomes himself a trustee. *Murray vs. Ballou*, 1 *John's. Ch. Rep.* 575.    *Selby vs. Alston*, 3 *Ves.* 341.    2 *Fonbl.* 153, 154, 155.    2 *Madd. Chan.* 103. 1 *Madd. Chan.* 364, 365.    The complainants, if they choose, have a right to disaffirm the contract with *R. S. Thomas*, and claim the property sold to him.    They may perhaps, ask that the sale be set aside; but they cannot claim a right to sell to the trustees, who never agreed to buy, and to make them pay an extravagant price for the land.

Again—If these points be in favour of the complainants, yet *T. Ringgold* gave to the defendants a bond of indemnity.    He, the *cestui que trust*, claimed the ferry property, purchased, as must be admitted, with trust funds, and that the trustees might not be prejudiced, gave them a bond to save them harmless against all loss.    If they are to be charged, then, with any loss sustained by them in consequence of this contract with *R. S. Thomas*, they have a right to resort to a part of the fund in the court of chancery for their indemnity.

To understand this case it is only necessary to observe, that from the record it appears that in the year 1798 *T. Ringgold* was entitled to a large real and personal estate, and at the same time was indebted to a considerable amount.    He is induced to execute a deed of trust, and thereby subjected to the trusts therein mentioned, not all of his property, but his real proper- ty, reserving still to himself, absolutely and exclusively, the *jus disponendi* of the whole of his personal estate—negroes, debts, money, stock, and every thing but his land.    The trusts declared in the deed· are simply to pay all debts, of whatever

description, then due; and *secondly*, the residue to be at his absolute disposal. His wife is mentioned in it, but she is men‹ tioned in order to secure to her, in the event of her surviving her husband, precisely what the law gives to her, without the consent of her husband. It is under this deed the sale of *Hopewell* was made, and of course no person, who could not claim to be a *cestui que trust*, had a right to impeach that sale. In 1807 a second deed was executed; and in this deed, for the first time, provision is made for the wife and children. This deed too conveyed, in addition to the land not already disposed of, all "his negroes, stock, horses, and plantation utensils," still reserving to himself the privilege of disposing, when and to whom he pleased, of all his money, bank and road stock, and all debts then due to him. The personal property at *Hopewell* had been previously sold, and the amount of sales constituted a portion of the debts due to him. The $7,000 due from *R. S. Thomas* did not pass by the deed of 1807, and has not been claimed by the creditors under that deed. Over all this fund, and especially the proceeds of sale of the personal estate at *Hopewell*, *T. Ringgold* had an absolute control, and this alone is an ample fund for the indemnity of the trustees. If then the trustees are to sustain any loss in the settlement of the account for the sale of the *Hopewell* estate, upon what princi- ple of law or equity are they to be deprived of the indemnity thus secured to them? Not because there is no fund, to which they can resort, because here is a fund, of which the owner re- tained an entire disposal, and quite sufficient for their reim- bursement. Not, surely, because this fund ought to be applied to the payment of the debts, as such a doctrine is a glaring out- rage upon every principle of right. It would be to strip a man of his property against his will. He provides by deed for the payment of his debts, and for the support of his family. He is to judge what property shall be conveyed by that deed; and for any such purposes he does not choose to transfer money, bank stock, or debts due to him. Could the court of chancery alter his deed, and subject to any of the trusts property which it was not his pleasure to subject to any of them? For the be- nefit of his creditors, and of his family, he places his lands, his negroes, &c. beyond his control. They are made by the

man, who alone has authority to dispose of them, to be the sole fund—1st. For the payment of debts; and 2d. To provide for the support of himself and family.   Of all the rest of his property, (if that conveyed by the deed of trust be sufficient to pay debts, even although the residue afforded a miserable support for his family,) he has a right, so courts of law and equity must say, to dispose as he pleases.   To appropriate this property not included in the deeds of trusts, (and the disposition of which the grantor reserved exclusively to himself,) to any of the purposes of the trust deed, would be a downright violation of the right of property—the exercise of a power by the court of chancery which no department of government can possess in a free country.   He had a right to give away this property, and so far as he yet retained the ability, he had a right, not only to sanction the sale made by his trustees, but to oblige himself to indemnify them from any damage which they sustained by reason of a disaffirmance of their sales, by creditors, or others, if others there were to impeach their conduct.

To deprive the defendants of the indemnity on which they rely, it cannot be said that *T. Ringgold* is to be treated as a person *non compos*, or from circumstances incapable of acting freely.   It would be a violation, not merely of established law, but of common justice, that such charges should be listened to in argument, when all mention of them is studiously avoided in pleading.   No one act of *T. Ringgold* is complained of—no settlement is impeached—no contract, into which he ever entered, is attempted to be set aside.   So far from this, the complainants claim under his deeds as valid.   They insist that he could dispose of his property.   They insist moreover on the deed of 1812, which gave to them their standing in the court of chancery.   If any such charge had been properly made, the record affords the most ample refutation of it.   As to the acquiescence &c. of *T. Ringgold*, they cited *Brice vs. Stokes*, 11 *Ves.* 319.   *Langford vs. Gascoyne*, *Ib.* 336.   *Trafford vs. Boehm*, 3 *Atk.* 444.   As to his competency, &c. they cited *White vs. Wilson*, 13 *Ves.* 88, 89. *Attorney General vs. Parnther*, 3 *Bro. Ch. Rep.* 442.

They insisted that it must be either fraud or supine, and very supine negligence, that induces a court of equity to deal

rigorously with a trustee. *Caffrey vs. Darby*, 6 *Ves.* 495. *Bovey vs. Smith*, 1 *Vern.* 144. Where a trustee conducts himself to the best of his judgment, the court will deal with lenity towards him. *Belchier vs. Parsons, Ambl.* 219. *Powell vs. Evans*, 5 *Ves.* 843. *Trafford vs. Boehm*, 3 *Atk.* 444. If the trustees had the right to take the ferries in exchange for *Hopewell*, then the admission of *S. Ringgold* was a mistake on his part and is not binding on him. *Lansdown vs. Lansdown, Mos.* 364. *Lammot vs. Bowly*, 6 *Harr. & Johns.* 500.

2. On the *second point*. In 2 *Fonbl.* 184, the general rule is laid down as to the liability of one trustee for the receipts of the other. He who wishes to get rid of a general rule must show the exceptions to it. The chancellor in his decree says that *Samuel* is to be charged, because he suffered *Tench* to misapply the trust fund. This was not the business of *Samuel*. He had no right to call upon *Tench*, nor *Tench* upon him. Trustees have all equal power and authority. 2 *Fonbl.* 184. The deed of 1798 was to secure a debt due to *Tench*, and to indemnify him for becoming one of the sureties of *Thomas*. How then could *Samuel* call upon *Tench?* An equal trust was reposed in both; and neither could control the other. If *Tench* abused the trust the *cestui que trust* might have applied to the court of chancery for his dismissal. The deed of trust executed by *Tench* to *Samuel* is to secure the latter against loss. If the complainants have any claim against *Tench*, they may resort to that deed; but they have no right because of that deed to call on *Samuel* in this suit. On this point they referred also to *Brice vs. Stokes*, 11 *Ves.* 319. *Hovey vs. Blakeman*, 4 *Ves.* 606. *Bacon vs. Bacon*, 5 *Ves.* 331. *Chambers vs. Minchin*, 7 *Ves.* 199.

3. On the *third* point. The case relied upon by the auditor, of *Dunscomb vs. Dunscomb*, 1 *Johns. Rep.* 508, to justify the charge of interest on all monies received after six months, is not in point. There nothing was to be done but to invest. In this case, before the trustees were authorised to invest one cent, they were bound to ascertain and pay all just debts, and contest those which were deemed unjust. It is in proof that there were debts of this description. *Maund* had recovered two judgments in the general court, one at May term 1798, and the

other at May term 1799, each for £1250, with interest from the 26th of July 1796, and costs. This claim was to be resisted, and was resisted in equity by *T. Ringgold.* It related to a sale made by *Maund* to *T. Ringgold,* of a parcel of land in a distant part of *Virginia.* The proof of the alleged fraud was to be obtained therein. Persons were to be discovered who would consent to act as commissioners to take testimony. Surveys were necessary, and to be made when it suited the convenience of surveyors to undertake them. Pending the suit in the court of chancery, the war with *England* broke out. *Maund* died, and new parties were to be made; and owing to these and other difficulties in the way of a decision, a final decree was not passed until March term 1818. We may well suppose that the defendant in that case was urgent for a decision, and would admit of no unreasonable delay. If it be charged that the complainant procrastinated it, or the trustees, it is apprehended that the record would show to the contrary, if it were necessary. It is not necessary, because no such charge is made in the bill; and the trustees are not chargeable with any breach of trust not charged in the bill. *Smith vs. Smith,* 4 *Johns. Ch. Rep.* 281. After the decree of the court of chancery the defendant appealed, and the decree of this court, affirming the decree, was passed at June term 1821. We think that while this case was pending the trustees were not authorised to invest any of the monies in their hands. We do not mean by this to say, that a disputed claim of a few hundred dollars would have justified the trustees in refusing to invest many thousands, or that this suit gave them a right to retain in their hands more than was sufficient to pay the debt, interest, costs, and all reasonable expenses. It cannot be contended that the trustees were bound to know what would be the fate of the suit against *Maund.* They were utter strangers to the *contract,* and the subject matter of it. They could not tell what would appear in proof. They could only know with certainty that judgments for large sums of money had been obtained at law against *T. Ringgold;* that these judgments were a lien upon the whole of the real estate which had been conveyed to them in trust, which they had sold, and for which they had received the purchase money.

That while the case was pending in chancery, the injunction might at any time be dissolved; and unless the money be immediately paid, the creditor could issue out his executions, and levy them upon the property sold, as well as the property of the securities in the appeal bonds. The issue of the suit in chancery being doubtful, the period of its decision equally so, whence the right of these trustees to make any investment of the funds, which by the express terms of the deed of trust were to be applied in the first place, and before any investment, to the payment of the debts then due, and of course *Maund's*, unless chancery would grant a perpetual injunction? Will it be said that the court of chancery could have authorised it? Can any man, by executing a deed of trust, though for the benefit of creditors, destroy a lien which an individual creditor had upon his property, and oblige him to acquiesce in the sale of that property, and wait for his money until the trustee can sell out stock, which he has purchased? Suppose in this individual case that the money had been invested, whether by or without the authority of the chancellor, and that the injunction being dissolved, the creditor had proceeded to levy upon the land; would the chancellor have granted another injunction to stay the sale until the money invested could be converted into money? If the trustees were bound or at liberty to invest, then they were to invest according to the deed, which authorised an investment in road stock, stock of the City Bank of *Baltimore*, or other bank stock; and what might have been the value of such investment we can easily ascertain. It was their duty, so it is argued, to invest; and if so, as they were authorised, they possibly might have invested in some of these funds which have so much depreciated in value. And if they had so invested, even by the mere express authority of the chancellor, and a decree had afterwards been pronounced in favour of *Maund*, will any man say they could have excused themselves for the loss of the funds, by alleging that they had invested the funds in stock now worth little or nothing, and therefore must be excused from the payment of the claims? Would they not have been charged with a breach of trust in investing without any authority to be found in the deed, funds which belonged to a credi-

tor? Who will affirm that the court of chancery, even after expressly authorising the investment, could have shown any mercy to the trustees? A trustee may be compelled to pay interest—in some cases compound interest. But in what cases? Where the trustee makes profits, and will not render an account of them. *Evertson vs. Tappen*, 5 *Johns. Ch. Rep.* 517. Where the deed creating the trust directs investments *of the interest*, and this is not done, compound interest is charged. *Raphael vs. Boehm*, 11 *Ves.* 92. S C. 13 *Ves.* 407, 411. And this because such is the law created with the trust. *Darne & Gassaway vs. Catlett*, 6 *Harr. & Johns.* 475. The judgments obtained by *Maund* might be considered, until the year this court decided the case, a claim existing against *T. Ringgold*, and possibly to be paid out of the trust fund. In support of the position that interest is not to be charged pending that suit, it is only necessary to refer to the case of *Newton vs. Bennett*, 1 *Bro. Ch. Rep.* 359. There the true principle, by which courts are to be governed, is laid down. In that case it will be found that *Bennett* did not take necessary steps to settle the estate. He retained money in his hands for several years. In 1760, the claim against the estate was compromised. "Till then, (says the chancellor,) it does not appear that *Bennett* kept the money in his hands *without a cause*, there being an outstanding demand." While there was a cause for keeping the money in his hands, while there was an outstanding claim, the chancellor at once decides that he is not to pay interest. "From 1760 the question is, whether he shall pay interest, having applied the money in the course of his trade." And from 1760 he was ordered to pay interest. According to this decision, while the demand of *Maund* was outstanding, the trustees did not retain the money in their hands *without cause*, and they are not to be charged with interest. It may be cited to prove that the complainants are entitled to interest from the decision of this court in *Maund's* case, as the trustees did not then invest; but the answer to this is, that before that decision, *T. Ringgold* was dead— the new bill had been filed, and the administratrix, and all persons having any claim to the estate, filed another bill, claiming the estate as *it was*, and insisting, not that it should be invest-

ed, but that it should be delivered up to them. From that time the trustees did not resist the claim, but consented that an account should be taken, and the trust settled up. On this point they referred also to *Littlehales vs. Gascoyne,* 3 *Bro. Ch. Rep.* 73. *Franklin vs. Frith, Ib.* 433. *Tew vs. Earl of Winterton,* 1 *Ves.* jr. 450, 451. *Pybus vs. Smith, Ib.* 193. *Bruere vs. Pemberton,* 12 *Ves.* 385. *Langford vs. Gascoyne,* 11 *Ves.* 333. *Rocke vs. Hart, Ib.* 59, 60. The mere act of co-operation does not charge a co-trustee with interest. *Bacon vs. Bacon,* 5 *Ves.* 331. *Chambers vs. Minchin,* 7 *Ves.* 192. *Langford vs. Gascoyne,* 11 *Ves.* 334. *Shipbrook vs. Hinchinbrook,* 16 *Ves.* 478. *Brice vs. Stokes,* 11 *Ves.* 324.

4. On the *fourth* point. In *England* a *per diem* is allowed to trustees for their trouble, &c. but that is not the rule here. The practice in our court of chancery is to allow a certain sum of money by way of commission. In the execution of this trust, the trustees have had a great deal of trouble, and the compensation to be allowed to them does not come within the rule as now established in chancery.

*Berrien, Hoffman,* and *Mayer,* for the Appellees, in the *first* appeal, on the *first, second, third* and *fourth* points.

1. On the *first* point. The alleged *exchange* of *Hopewell* for the *ferry property,* was *dehors* the powers of the trust, and wholly illegal. 1. This was no technical exchange, even had the trustees possessed the power to exchange. *Shep. T.* 295. *Co. Litt.* 31, *s.* 319. If this transaction rested only on the deed of 1798, Mrs. *Ringgold* would have dower in the *ferry property,* as well as in *Hopewell. Cass vs. Thompson,* 1 *New Hamp. Rep.* 65. 2. The sale or exchange was too hasty. *Ex parte Bennett,* 10 *Ves.* 393. *Hart vs. Ten Eyck,* 2 *Johns. Ch. Rep.* 110. 3. The ferries were not trust estate. *Tafford vs. Boehm,* 3 *Atk.* 440. A trustee cannot, even without *mala fides,* invest in a fund not sanctioned by a court of equity. If the court does not adopt the fund, the trustee must bear the loss. *Hancon vs. Allen,* 2 *Dick.* 498. A trustee, guardian, &c. cannot, without *special* power, change the nature of the estate from money into land, or *e converso;* or a lease for years into a freehold. *Witter vs. Witter,* 3 *P. Wms.*

100, (and *notes.*) *Terry vs. Terry*, *Pre. in Chan.* 273. *Mason vs. Day*, *Ibid* 319. *Pierson vs. Shore*, 1 *Atk.* 480. *Rook vs. Warth*, 1 *Ves.* 461. *Audley vs. Audley*, 1 *Dick.* 16, 45. 1 *Ves. jr.* 35. 6 *Ves.* 487. 4. The value of *Hopewell* must be fixed at $20 per acre. When a trustee displaces, destroys, or unduly converts trust property, chancery will give to the *cestui que trust* the *extreme value of it*, analogous to the rule of law of giving, in trover, the *highest* value, unless the article be shown to be certainly of less value. *Amory vs. Delamiere*, 1 *Stra.* 505. As the trustees declined to ascertain its value by several offers, and have thereby rendered it extremely difficult to say what it was really worth; as it might have brought at some subsequent period, even $30 per acre, the complainants are entitled to the highest value, even on the principle of confusion, mixture, &c. of trust, with private estate, as settled in *Lupton vs. White*, 15 *Ves.* 439, 440. *Attorney General vs. Fullerton*, 2 *Ves. & Bea.* 263. *Earl Powlet vs. Herbert*, 1 *Ves.* 296. *Forrest vs. Elwes*, 4 *Ves.* 491, 497. *Pocock vs. Reddington*, 5 *Ves.* 794. *Harrison vs. Harrison*, 2 *Atk.* 121. *Hart vs. Ten Eyck*, 2 *Johns. Ch. Rep.* 62, 116, 117. 5. None of the expenditures on the ferries can charge the trust estate. *Bostock vs. Blakeney*, 2 *Bro. Ch. Rep.* 653, 656. *Green vs. Winter*, 1 *Johns. Ch. Rep.* 27, 39. 6. Wherever the trust is violated, the *cestui que trust* is entitled to all the *gain*, if there be any, and an exemption from loss, if there be any. *Adye vs. Fenilletean*, 1 *Cox*, 60, 63, and the authorities before cited.

The trustees are not entitled to *any* benefit from *Thomas Ringgold's* sanction or approbation of the conduct and accounts of the trustees; that independently of various known principles, flowing from the relation of trustee and *cestui que trust*, he was, in fact, incompetent so to do, from the infirmity of his mind, which rendered him *non sui juris*, and which was the very *causa et origo* of the trust. Neither to the whole amount, nor any part thereof, can *Thomas Ringgold's* sanction protect the defendants from legal scrutiny, and liability to make full redress. 1 *Pothier on Oblig.* 29, 30. *Newl. on Cont.* 362, 433, 445, 451, 459. *Portington vs. Eglington*, 2 *Vern.* 189. *Sugd.* 401. *Gibson vs. Geyes*, 6 *Ves.* 226. *Hu-*

*guenin vs. Baseley,* 14 *Ves.* 273.    *Villars vs. Beaumont,* 1 *Vern.* 100.    *Smith vs. French,* 2 *Atk.* 243.    *Newman vs. Payne,* 2 *Ves.* 199.    *Duke of Hamilton vs. Lord Mohun,* 1 *P. Wms.* 118.    3 *Wood. Lect.* 453.    *Wells vs. Middleton,* 1 *Cox,* 112.    *Morse vs. Royall,* 12 *Ves.* 374.    4 *Desauss.* 704. *Stanhope vs. Topp,* 2 *Bro. Ch. Rep.* 183.    *Murray vs. Palmer,* 2 *Scho. & Lef.* 474.    *Matthews vs. Dragaud,* 3 *Desauss.* 25, 26, 27.    *Green vs. Winter,* 1 *Johns. Ch. Rep.* 35, 36, *Wendell vs. Van Renssellaer, Ibid* 344.    They then argued, that the liability of the trustees as to *Hopewell,* was to be determined under the terms of the deed of trust of December 1807; but that, if that deed was not to be the rule of their responsibility, then that even under the deed of 1798, *Thomas Ringgold* had no power left of disposing of *Hopewell,* or sanctioning the exchange of it for the *Ferries;* and to maintain this position, they discussed the limitations of the deed of 1798, in reference to the quantity of estate under it in *Thomas Ringgold,* and the principles of the rule in *Shelly's* case.

They argued, that there was no fund whatsoever in the hands of the trustees, of which *Thomas Ringgold* had any control, and to which his sanctions were applicable;  that the bonds and securities derived from *Benjamin Ringgold's* trust administration, were comprehended under the term of equitable estate in the deed of 1798—but that at all events those securities were realized long before the sanctions of *Thomas* were given, and the avails applied or applicable to payment of *Thomas's* debts, so that there was no control in *Thomas,* over these funds, at the time of his sanctioning the accounts of the trustees; and even to the extent of those avails, the sanctions could not have any effect.    That in this view, it did not matter, whether the securities for the sales of *Thomas's* land, that came into the hands of the trustees from *Benjamin,* passed them under the deed of trust of 1798.

They also argued, that the personal estate on *Hopewell,* and *Huntingfield,* was to be deemed as sold under the deed of December 1807, as to the liability of the trustees; and even if that were not so, the trustees were to be held liable for it in consequence of their admissions respecting it, and blending it with their accounts of assets and payments, as trustees.

2. On the *second* point. The trustees are jointly, as well as severally responsible for all monies, property, *&c.* received by them, or either of them. And if not so *a priori,* yet they have become so from the circumstances attending their administration of the trust. The distinction between executors and trustees, in regard to their responsibility *in solido,* is fully admitted; but the law has too firmly settled and defined the *principle* of the joint liability of *trustees,* to admit of its being at all affected, by the well known distinction between executors and trustees. But admitting its fullest force, it has no application whatever to trustees, except where the conduct of the trustee, claiming an exemption, has been strictly within the bounds of his trust duty, and where the delinquent trustee was in no way facilitated by the acts or omissions of his companion. This principle will be found to pervade all the authorities, and to afford the true key which ascertains the liability *in solido* of trustees, and is a principle wholly independent of the one which ordinarily implicates *executors,* and exempts *trustees.* The received law on the subject is, that trustees and executors, *prima facie,* are equally responsible, *virtute officii,* for all monies, &c. received on account of the trusteeship or administration. But where, *in point of fact,* only one has received money, &c. there is generally a difference between executors and trustees as to the *evidence* which implicates them *in solido.* For executors need not join in any receipt, or conveyance; they are competent to act *separatim.* Trustees, on the contrary, are expected to unite in receipts, and must join in conveyances. Hence, if executors unite, they are both liable at *law,* though one only may have received the money. At *law,* there is a *presumptio juris et de jure,* that they both received it, and therefore both liable; but in equity, the facts may be inquired into, and they be charged jointly or severally, according to circumstances. A *joint* receipt or conveyance, however, even in equity, raises a strong presumption against both, be they executors or trustees; but even in the case of *executors,* it is not conclusive in equity. Trustees, on the other hand, do not at *law,* or in *equity,* materially *increase* the presumption of joint responsibility by uniting in receipts, because they are expected so to do, even

when, *in fact*, they do not jointly receive the money. As the doctrine has been modelled, and fully established, there appears to be little or no distinction in equity between trustees and executors. The distinction between executors and trustees, in this respect, never did extend further than as it was a mere *question of evidence*, arising from their *jointly receipting*. The inquiry, now, in either case, is not so much in relation to *joint receipts*, &c. as it is into the various acts of co-operation, omission, undue confidence, and untrustworthy conduct on the part of that trustee, or executor, who claims an exemption. If, therefore, a trustee or executor, by any *act*, *omission*, *supine negligence*, or *undue confidence*, abandons any portion of the fiduciary estate to his companion, so as to tend to its jeopardy or final loss, this *per se* is a breach of trust, and subjects such trustee or executor to all losses consequent on such *crassa negligentia*, without any regard to acts of direct co-operation, such as receipts, conveyances, &c. &c.; and *all the modern authorities have uniformly charged trustees, in solido*, under the auspices of this principle. But we fully admit, that if one trustee, *ex mero motu*, and without the *concurrence* or *neglect* of his companion, secures and wastes a portion of the trust fund, the innocent trustee is not responsible for his defalcations, and this too, even though there has been joint receipts and joint conveyances. This case may be safely reposed on this liberal view of the doctrine of joint and several liability. No case can be found which exempts a trustee, merely because he received *no portion* of the wasted estate. Both law and equity requires a further scrutiny, and the received doctrine is, that the *only important inquiry is, whether the companion who wasted the estate was in any degree facilitated therein by the acts or omissions of the other; if so, they are both equally liable.* All the authorities now concur that the inquiry is not as to the evidence of the existence, or non-existence of joint receipts or conveyances—this being a mere *prima facie* evidence of responsibility *in solido;* but the fact to be ascertained is, whether one trustee has *suffered* another to obtain such an *exclusive* control, as enabled that trustee to violate the trust. In such case, they are both liable, one as the *receiver* and *destroyer* of the trust

estate, the other as the *passive means* of the mischief which has been done.   Hence, if a trustee *joins* in receipts, &c. he may still be *exempted*; and if *he does not join,* he may still be charged.   The nature of the trust also is very material to be *inquired* into.   Whenever the trust is *directory*, and not *discretionary*, they are bound to *see to each other's acts.*  The counsel for respondents were ever willing to lose sight of this important principle.   The trustees were expressly bound to *invest*, and in *specific funds*; they jointly invested in *different* funds, and also jointly omitted to invest the balance in any fund.   *Negligence*, and a non-performance of *prescribed duties*, is the controlling circumstance which ascertains the liability *in solido.*   Trustees are always liable, *in solido*, for the acts of *agents*, if they are not *expressly* authorised to appoint agents.   If, therefore, *Samuel* constituted *Thomas* his agent, as he says he did in the *M'Mechen* transaction, or if he permitted *Tench* to assume an exclusive control of any portion of the estate, he thereby constituted him an agent, and both are responsible in these cases, for any losses that may arise.   *Samuel* never was in advance, except by reason of his own gross negligence in permitting *Tench* to violate every principle of the trust; and after the mischief was done, *Samuel*, conscious of his neglects, omissions, and untrustworthy acts, and that he must respond for *Tench*, received from him an *ample indemnity.*   But if the *facts* of the case be inquired into, the question of joint and several responsibility, even if decided in favour of the respondents, would cover but a small part of the case—*because there are but very few transactions in which they did not unite, and positively participate,* which would render them responsible even on the most favourable application to the respondents, of the doctrine in controversy—so that *quacunque via data*, they are liable *in solido.*   But the law is now fully settled.   *In all* of the cases, when cautiously examined, from the case of *Townley vs. Chalenor, Cro. Car.* 312, down to *Monell vs. Monell, 5 Johns. Ch. Rep.* 283, it will be found that the courts have been gradually advancing to the positions we have laid down; and the many *moot* points of distinction between joining and not joining in receipts, &c. between the liability at law, or in equity;

between the responsibility *in solido* of executors, and not of trustees; between the claims of creditors on executors, or legatees on executors, &c. &c. have all, in succession, been nearly abandoned, and the plain, *elementary* doctrine of all courts now is, *that they will look to the conduct both of trustees and executors, and if the loss be the fault entirely of one,* he alone *shall respond; but if it be the result of the acts, omissions, gross negligence of the other, they shall both equally respond.* It never was decided, that if *one only* reaps the fruits, or receives the money, after a *joint breach of trust,* both shall not respond; but the true distinction is as just stated, viz: that wherever any one, acting in a fiduciary relation, permits his companion to exercise any control over the trust fund, *inconsistent* with the obligations of *both,* (and whether there be an *agreement* to that effect, or a mere *supine negligence,* is immaterial,) they both are liable *in solido.* Hence, the fact of *receipting jointly* is a mere item of evidence, even in the case of *executors,* and the main inquiry is not even *who received* the money, but whether there has been any *acquiescence* in one, after he *knew,* or ought to have known, that the trust money, &c. *had got into a course of abuse."* Nor is it at all requisite, in order to charge both for the defalcations of one, that there should be any fraud, sinister motive, or profit in the trustee who claims exemption.

Admitting then the fullest force of the *general* distinction between co-executors, and co-trustees, the whole current of authorities sustain the positions advanced. They then cited *Churchill vs. Hobson,* 1 *Salk.* 318. S. C. 1 *P. Wms.* 241, *(and note.) Townley vs. Calenor, Cro. Car.* 312. S. C. *Bridg. Rep.* 35. *Fellowes vs. Mitchell & Owen,* 1 *P. Wms.* 81. S. C. 2 *Vern.* 504, 515. 21 *Vin. Ab.* 583, pl. 2, 8. *Murrill vs. Cox & Pitt,* 2 *Vern.* 570. *Westley vs. Clarke,* 1 *Eden's Rep.* 356; and 1 *P. Wms.* 83, *(note.)* S. C. 1 *Dick.* 329. *Townsend vs. Barber,* 1 *Dick.* 356. *Leigh vs. Barry,* 3 *Atk.* 583. *Gill vs. Attorney General, Hardres,* 314. *Charitable Corporation vs. Sutton,* 2 *Atk.* 404, 405, 406. *Boardman vs. Mosman,* 1 *Bro. Ch. Rep.* 68. *Sadler vs. Hobbs,* 2 *Bro. Ch. Rep.* 116. *Scurfield vs. Howes,* 3 *Bro. Ch. Rep.* 90. *Keeble vs. Thompson, Ib.* 112. *Baldren vs. Scott,* 2 *Ves.* 678.

*Hovey vs. Blakeman,* 4 *Ves.* 506, 603, 608. *Caffray vs. Darby,* 6 *Ves.* 487. *Chambers vs. Minchin,* 7 *Ves.* 186, 196, 199. *French vs. Hobson,* 9 *Ves.* 103.   *Lord Shipbrook vs. Lord Hinchinbrook,* 11 *Ves.* 252.   S. C. 16 *Ves.* 476.   *Brice vs. Stokes,* 11 *Ves.* 318, 319.   *Langford vs. Gascoigne, Ib.* 333. *Adair vs. Shaw,* 1 *Sch. & Lef.* 340.   *Doyle vs. Blake,* 2 *Sch. & Lef.* 229, 237, 242.   *Townshend vs. Baber,* 1 *Dick.* 156, 356.  S. C. *Bridg. Rep.* 38.   *Underwood vs. Stevens,* 1 *Meriv.* 712.   *Westley vs. Clarke,* 1 *Eden,* 357.  *Anonymous,* 12 *Mod.* 560.     21 *Vin. Ab.* 525, pl. 2, 3, 4.     2 *Fonbl.* 182, *(note l,)* 183.   1 *Cruse's Dig.* tit. 12, *s.* 36, 37, 39.     2 *Brid. Ind.* 651. *s.* 214, 221, 224, 238, 239, 242.     *Ham. Dig.* 643, 297, 298, (s) (d) (u).     *Toller's L. Ex.* 485, 486.    *Monell vs. Monell,* 5 *Johns. Ch. Rep.* 283.   11 *Johns. Rep.* 21.    *Munford vs. Murray,* 6 *Johns. Ch. Rep.* 1, 452.   *Lenoir vs. Winn,* 4 *Desauss.* 65, 76.  6 *Mod.* 93.  2 *Eq. Ca. Ab.* 742.   12 *Mod.* 573.   5 *Ves.* 839.   8 *Ves.* 363.

3. On the *third* point they cited *Franklin vs. Frith,* 3 *Bro. Ch. Rep.* 433.   2 *Fonbl.*   *Newton vs. Bennet,* 1 *Bro. Ch. Rep.* 359.   *Treves vs. Townsend, Ib.* 384.   *Foster vs. Foster,* 2 *Bro. Ch. Rep.* 616.

4. On the *fourth* point they cited *Fearns vs. Young,* 10 *Ves.* 184.

*Berrien, Hoffman,* and *Mayer,* for the Appellants, in the *second* appeal, on the *fifth, sixth, seventh* and *eighth* points.

5. On the *fifth* point. The auditor in his report esteems the answers, as to all matters of account, as of themselves final proof, and that as to such matters the answers are simply responsive, and not, in any measure, in avoidance. To enforce this singular doctrine, he also relies on the difficulty of the trustees getting proof, or producing vouchers after such a lapse of time. The chancellor also adopts this reasoning, and appears to have entirely misapprehended some of the clearest authorities on this point. The complainants fully admit the general rule that an answer is *per se* proof, and requires counter evidence of at least one witness and pregnant circumstances; but contend that this rule has no application whatever to the present case. The positions taken by the complainants are these:

1. That they have never relied, in any degree whatever, on information furnished by the answers, but on the contrary, have proved, by independent testimony, the entire amount with which they charge the defendants. 2. That the disbursements by the trustees are in all instances, except such items as postage, current expenses, and such like, to be sustained by proof, or vouchers; and that the answers, setting forth disbursements, are not responsive merely, but in *avoidance,* and set up *claims,* which must be sustained by proof; and no authority can be found which gives to an answer any operation beyond this. 3. That no court will allow respondents to rely at all upon answers, which come reluctantly in, after all the proofs are furnished by the complainants, and they have been driven to the necessity of searching every where for evidence, without the least reliance on any light shed by the answers. 4. That where a distinct fact is set forth in the bill, and denied by the answer, or where information on a particular subject is requested by the bill, and furnished by the answer, then the answer is evidence; but a bill which merely asks for an account, is not of that nature which enables the respondents to *make proofs for themselves,* by stating that so much was received, and so much paid away. The books have never gone to that length, and all principles, and authorities, we apprehend, sustain a doctrine just the reverse. 5. The utmost liberality has been manifested by the complainants, in writing *"admitted"* on every *fair* and *comprehensible* voucher: and this was asked for by the respondents, and granted by the complainants under the idea that the *answers* proved nothing, and that all accounts not *thus admitted,* or *proved* by the respondents, were *not fortified* by the answers. 6. The cases which admit a defendant's answer as proof for him, are always where some fact alleged by the bill is *denied;* and there is a clear distinction between *denial* and *affirmation,* setting up *a claim,* and swearing himself *into a right;* so also these cases distinguish between matters susceptible of proof, and such as lie, from *their nature,* within the *knowledge* and *conscience* of the respondent. 7. It is also to be borne in mind, that in many of the cases which allow this force to the answers of defendants, the parties were examined as *witnesses* on interrogatories before the master, a proceeding

unknown to our practice. Such was the case of *Kirkpatrick vs. Love, Ambler,* 589, and many others. 8. We are also to distinguish between reading an *answer* in chancery, in *another* suit, or in a *suit at law;* and where it is read in *equity,* in the same suit—there the *established* doctrine is, that *one part* of an answer *may* be read against the party, without reading the other, and the complainant *may* select a particular admission and rely on it, and yet put the defendant to prove *other facts;* and the *whole current* of authorities sustain this. *Norris' Peake's Evid.* 86, *(note.)* *Hart vs. Ten Eyck,* 2 *Johns. Ch. Rep.* 88, 89. *2 Poth. on Obl.* 155 to 158, *(and note.)* 9. But even if the doctrine be *enlarged* for the benefit of the respondent, it never applies except where the answer is clear, satisfactory, and pointed; it never embraces general statements, schedules, &c. which do not fix the force of the *oath* pointedly on the particular transaction. In this point of view, *Samuel's* answer has no application to the *M'Mechen, Wilmer's,* and other transactions; nor can *Tench's* answer fortify *Samuel's* alleged disbursements. They cited *Alam vs. Jourdan,* 1 *Vern.* 161. *Anonymous,* 1 *Vern.* 282. *Wickerly vs. Wickerly,* 1 *Vern.* 470. *Walton vs. Hobbs,* 2 *Atk.* 19. *Janson vs. Raney,* 2 *Atk.* 140. *Robinson vs. Cumming,* 2 *Atk.* 410. *Ouly vs. Walker,* 3 *Atk.* 407, (2 *Com. Dig.* 332.) *Pemba vs. Mathers,* 1 *Bro. Ch. Rep.* 52. *Kirkpatrick vs. Love, Ambler Rep.* 589. *Blount vs. Burrows,* 4 *Bro. Ch. Rep.* 73. *Thompson vs, Lamb,* 7 *Ves.* 588. *Ridgeway vs. Darwin,* 7 *Ves.* 404. *Lady Ormond vs. Hutchinson,* 13 *Ves.* 47. *East India Co. vs. Donald,* 9 *Ves.* 275, 283. The leading case which establishes the sound doctrine on this subject, and which has never been repudiated, or in the least qualified, is the one which occurred in 1707, before Lord *Cowper,* and is reported by *Gilbert* in his *Law of Evidence,* 45. 3 *Blk. Com.* 451. The chancellor, in his decree, has passed on this case a most singular *criticism,* and one which, we think, is far from just. We do not perceive the least "*ambiguity*" in the case; for surely it does not mean that one who was *dead,* made a donation; or that one who was *alive* at the time, was then a *testator.* But it simply means that the defendant had, in the lifetime of his testator, received a deposit of £1100, and

that on a settlement between him, who *afterwards* was a testator, with him who *afterwards* was an executor, £100, part of the £1100, was given to the defendant in satisfaction of the services he should subsequently render as executor. This case is commented on, and entirely approved of by Chancellor *Kent*, 2 *Johns. Ch. Rep.* 88. That £1100 was the entire sum *deposited*, was proved by the answer, but the *gift* of £100 required proof *aliunde*. 2 *Ball and Beatty*, 382; *Ham. Dig.* 425, (a). 1 *Bro. Ch. Rep.* 502; 2 *Com. Dig.* 332; 2 *Fonb. chap.* 7, *s.* 4. An *answer per se*, perhaps, should never be evidence against an *infant cestui que trust*. Trustees ought to be *compelled* to keep books, *take*, and *preserve* vouchers: but here are *thousands* of dollars claimed by the trustees on no voucher whatever. *Hart vs. Ten Eyck*, 2 *Johns. Ch. Rep.* 62, 66, 86 to 94, 96, 107, 119. This case assembles nearly all the *English* and *American* cases, and the entire bearing on the subject. *Green vs. Hart*, 1 *Johns. Rep.* 589, 590. *Monell vs. Monell*, 5 *Johns. Ch. Rep.* 283, 294, &c. *Parker vs. Kennedy*, 2 *Desauss.* 37. *The State vs. Penman*, 2 *Desauss.* 1. *Beckwith vs. Butler*, 1 *Wash. Rep.* 225. *Ballinger vs. Worley*, 1 *Bibb*, 195. *Paynes vs. Coles*, 1 *Munf.* 373. *Scurfield vs. Howes*, 3 *Bro. Ch. Rep.* 90, 95. Here the answer of a co-trustee, charging himself *exclusively*, was not, *per se*, considered as evidence of the separate receipt, and liability. *Miller vs. Beverleys*, 4 *Hen. & Munf.* 422. *Pollard vs. Lyman*, 1 *Day*, 165. *The Auditor vs. Johnson*, 1 *Hen. & Munf.* 536. *Heffner vs. Miller*, 2 *Munf.* 43. *Beatty vs. Thompson*, 2 *Hen. & Munf.* 395.

The object of the trust was investment, and all that interfered with that, or retarded it, should be affirmatively and unquestionably shown. The trust fund was to be *diminished* as *little* as *possible;* and therefore the necessity of the payments should be shown. Payments here are in the nature of counter-claims, on the part of the trustees, against their *cestui que trusts*, and, therefore, should be proved; and on that head the answer could not, in the nature of things, be deemed responsive to the bill, unless the bill had charged *specific* breaches in particular *undue payments* by the trustees. They argued this was in effect only a general bill for an account; and

that it was a *petitio principii* to say that the answer was evidence of the payments it stated, because the bill required "a particular account of the trustees' transactions under the deeds of trust."

The answers of both of the trustees being reluctant, uncandid, unsatisfactory, and rendered only after all the proofs were obtained by the complainants, are to be received with great caution, and to be construed by the court dubiously, and with scrutiny; allowing to them much less respect and weight than might have been accorded to them, had they been *in time, willing, full,* and *candid.* Freeman vs. Fairlie, 3 Meriv. 29, 41. White vs. Williams, 8 Ves. 193. Haim. Dig. 421, *s.* 5; 422, (k,) 425, (a.) Green vs. White, 1 Johns. Ch. Rep. 33, 40. Hart vs. Ten Eyck, 2 Johns, Ch. Rep. 62, 107, 108. Faulder vs. Stewart, 11 Ves. 303. Smith vs. Scarle, 14 Ves. 415. 2 Madd. Ch. 343. Hepburn vs. Durand, 1 Bro. Ch. Rep. 503. 3 Meriv. Rep. 29, 41.

6. On the *sixth* point. Interest is to be charged on all receipts from their *dates*, as the trustees never invested, and never *intended* to invest. That if a rest of *six months* be allowed, they are then chargeable with *compound* interest, or interest on the *annual balance of principal and interest.* The authorities clearly establish the following positions: 1. Trustees, executors, &c. are chargeable with simple interest wherever there were disposable funds of the estate in their hands, which the exigencies of the estate did not necessarily *prevent* being placed at interest. 2. If they be empowered to put money to interest, and merely let it *remain idle by them,* they are responsible. 3. If they have traded with the trust funds, they are not only liable to interest, but to the *profits,* if any, beyond the interest. 4. If they retain monies by them, hesitating what to do, they shall pay interest, as it was their duty to apply to the court of chancery for instructions. 5. Whenever the least in fault, they are chargeable in *England* with the highest interest, viz. 5 *per cent.* if not in fault, then with 4 *per cent.*—money being usually worth no more in that country. 6. Wherever their duty is *prescribed,* as for example, to *invest,* and they have neglected it, but which, if performed, would have given the *cestui que trust*

interest upon interest, the trustees shall be liable to *compound* interest, or interest on the annual balances of principal and interest. 7. *Formerly*, interest was allowed only from the *time of audit*, if respondent answered freely and fully, and from the time of the *bill* filed, if reluctantly; now, no such distinction—but trustee is liable from the time he might have invested. Upon the subject of *simple interest*, they cited 10 *Mod.* 21. 2 *Eq. Ca. Abr.* 740. *Parrot vs. Treby*, *Pre. in Ch.* 254. *Newton vs. Bennet*, 1 *Bro. Ch. Rep.* 35, *(and note a.)* *Perkins vs. Baynton*, 1 *Bro. C. R.* 375. *Treves vs. Townshend*, *Ib.* 384. *Dawson vs. Massey*, 1 *Ball & Beatty*, 219. *Tebbs vs. Carpenter*, 1 *Madd. C. R.* 290. *Forbes vs. Ross*, 2 *Bro. C. R.* 430. *Littlehales vs. Gascoyne*, 3 *Bro. C. R.* 73. *Franklin vs. Frith*, 3 *Bro. C. R.* 433. *Hillard's* case, 1 *Ves.* 90. *Young vs. Combs*, 4 *Ves.* 103. *Forrest vs. Elwes*, 492. *Piet vs. Stace*, 4 *Ves.* 620, 622. *Pocock vs. Reddington*, 5 *Ves.* 794. *Rock vs. Hart*, 11 *Ves.* 57, &c. *Bruyere vs. Pemberton*, *Ib.* 386. *Ratclif vs. Graves*, 1 *Vern.* 196. 2 *Ver.* 744. 1 *P. Wms.* 396. *High. on Lunacy*, 77. "The *first* duty of a trustee, executor, agent, receiver, &c. is to be constantly ready with his accounts, and neglect in this, charges them with interest." *Heathest vs. Hulme*, 1 *Jac. & Walk.* 122, 135. *Massey vs. Banner*, *Ib.* 250. *Turner vs. Turner*, 1 *Jac. & Walk.* 43. *Treves vs. Townsend*, 1 *Cox*, 50, (note 2.) *Forbes vs. Ross*, 2 *Cox*, 112, 113, &c. 2 *Madd. Chan.* 134. 2 *Fonb.* 184 to 188, *notes (o) (p.)* *Mosely vs. Ward*, 1 *Ves.* 581. *Dornford vs. Dornford*, 12 *Ves.* 127. *Stock vs. Stock*, 1 *Desa. C. R.* 193, *(note.)* *Fox vs. Wilcox*, 1 *Binney*, 195. *Hall vs. Callaghan*, 1 *Serg. & Rawle*, 241. *Lenoir vs Winn*, 4 *Desa. C. R.* 71, 454. *Miller vs. Beverly*, 4 *Hen. & Munf.* 415 to 418. *Quarles vs. Quarles*, 2 *Munf.* 321, 325. *Carter's Ex. vs. Cutting and Wife*, 5 *Munf.* 223, 233. The existence of *outstanding debts* has never been considered as justifying trustees' omission to invest, or at all affecting their responsibility for interest. If the monies had been invested in stock, instead of the ferries, this item alone would have produced, *at this day*, $53,000. *Maund's* debt was nominal, and to the amount *claimed*, they might have *invested* as well as *retained;* for the judgment was enjoined, and *Maund never*

made any motion to *dissolve,* nor the respondents to *perpetuate;* but twenty years after the injunction, the *complainants* themselves, (the *trustees* having *abandoned* the trust,) obtained its dissolution. *Gray vs. Thompson,* 1 *Johns. C. R.* 82. *Dunscomb vs. Dunscomb,* 1 *Johns. C. R.* 508, 535. *Shiffelin vs. Stewart,* 1 *Johns. C. R.* 620. *Brown vs. Ricketts,* 4 *Johns. C. R.* 303. *Minuse vs. Cox,* 5 *Johns. C. R.* 441, 448. *Murray vs. Munford,* 6 *Johns. C. R.* 17, 452. 7 *Johns.* 265. 4 *Des.* 369, 556.

On the subject of compound interest they contended, 1. That compound interest is as moral and legal a claim as simple interest, wherever interest upon interest has been made, or might, and ought to have been made. The *interest,* upon the dividends or interest, must be somewhere, and if made, is the property of the owner of the principal:—if not made, and there is no *gross negligence,* the courts, so far favour a debtor, executor, guardian, or trustee, as not to charge them with it; but whenever the duty is plain, and it has been clearly violated, compound interest is uniformly allowed by the decisions, not only of *England* and the *United States,* but of most other countries. 2. Where the trust directs investment, and none is ever made, but, on the contrary, the trustee never intended to make any, the courts uniformly allow compound interest, or, what amounts to the same, the interest is added on the *yearly balances* of principal and interest. 3. Merely as between *debtor* and *creditor,* interest upon interest is rarely allowed—but still compound interest is as recognised a right in certain cases, as simple interest is. They cited *Waring vs. Cunliffe,* 1 *Ves.* Jr. 99, *(and note* 1.*) Schiffelin vs. Stewart,* 1 *Johns. Ch. Rep.* 624 to 629. *Newton vs. Bennet,* 1 *Bro. C. R.* 359. *Earl of Lincoln vs. Allen,* 6 *Bro. P. Ca.* 319. *Robinson vs. Cumming,* 3 *Atk.* 410. *Raphael vs. Boehm,* 11 *Ves.* 92, 108, 109 *Hammond's Dig.* 332, *s.* 5. *Ashhurnham vs. Thompson,* 13 *Ves.* 403. *Raphael vs. Boehm,* 13 *Ves.* 407, 590. *Peirce vs. Rowe,* 1 *New Hamp. Rep.* 183. *Dornford vs. Dornford,* 12 *Ves.* 127. *Kennon vs. Dickins, Cam. & Norw.* 361. *Nightingale vs. Lawson,* 1 *Bro. C. R.* 440, 443. The case now before the court, is one demanding the allowance of compound interest much more strongly than

in the case of *Catlett vs. Darnes*, 6 *Harris & Johns. Rep.*
475, 482. In this case, it is proved that the trustees have spe-
culated on $18,000, at least, of the trust estate. They not
only never invested one cent as directed, but they invested
$18,000 in a wild speculation of their own. They completely
amalgamated the *entire trust* estate with their own. They not
only let monies remain idle, but being directed to invest, they
used the trust money, paid *no debts* until compelled, and in-
volved the estate into costs, and fees of all kinds. Even the
allowance of compound interest might not fully indemnify the
complainants; and though trustees are not to be severely dealt
with in cases of mere negligence, yet when their duty is plain,
and they have never manifested the least intention to make the
estate productive, and to surrender their talent with its proper
increase, equity not only allows compound interest, but will
scrutinise every account. Giving therefore, the fullest extent
of the *odium* justly attached to *compound interest*, when it
is used as a means of unseemly gain, the *courts adopt it with
alacrity, as the only means of attaining justice*, wherever
persons in fiduciary relations, have forgotten the *widow's* and
the *orphan's* portion, and heedlessly disregard plain direc-
tions, and simple duties.

They argued that the pendency of *Maund's* claim did not
exempt the trustees from the charge of even compound inte-
rest; and examined the authorities cited on the other side, in
the previous argument, as to the effect of outstanding claims,
to relieve trustees from the charge of interest; and contended,
that it was incumbent on the trustees, in order to exempt them-
selves from the charge, to show that they had deposited the
money in chancery, or secured it under the sanction of chan-
cery, so as always to be ready for the *cestui que trusts*, or to
meet the judgment of *Maund;* and that it was the duty of the
trustees, to save themselves from interest, to apply to the chan-
cellor to have the funds, adequate to Maund's judgment, in-
vested, while the suit, in regard to the judgment, was pending;
and as the time of its termination was, of course, uncertain.

7. On the *seventh* point, they contended, 1. That the settled
and unvarying doctrine of the common law is, that private trus-
tees, who have not stipulated for a compensation, act *gratui-*

*tously,* and that no compensation or reward can be decreed to them. That under the head of "just allowances," their necessary charges, and a small indemnity for days or time *actually* spent in executing trust duties, will be granted, when the *time is clearly* made out. 2. That no statute, act of assembly, or rule of court, having altered this established law, this court, if it allows commissions in this case, must judicially legislate. And though the validity of even a *rule of court,* in such case, might be questioned, yet as there is no such rule, a *decision* in this case, contrary to the common law, and in the absence of any statutory provision, or rule of court, would be a decree establishing a *rule retrospectively.* 3. That even if commissions be allowable, it is still not a *fixed* commission of 5 per cent. but is under the *discresion* of the court; and as *no service* has been rendered, and all *expenses* have been liberally allowed, this court will not go beyond a *per diem,* which the trustees have failed to prove: or if a commission, in lieu of a *per diem,* then a commission of one or two per cent. for the sake of approximation to a *per diem.* 4. That if compound interest be refused to complainants, that then the entire commissions ought to be refused to the respondents, as the former claim rests on moral and legal reasons; the latter, on moral grounds only, and this too, only in the case of zealous and meritorious services, and a willing, full, and satisfactory settlement. And the court's discretion will be applied both to the *fact of the allowance,* and the rate of commission. The *Roman* law was decided, that nothing beyond reasonable and just expenses should be allowed to a trustee. *Lucrum facere ex pupilli tutela tutor non debet. Dig.* 26, 7, 33. *Domat,* book 2, *s.* 2, pl. 3; *s.* 3; pl. 35. The common law was always so as to bailiffs, guardians, &c. *Co. Litt.* 89. *Litt. s.* 123. So of a mortgagee in possession, 1 *Ver.* 316. 2 *Atk.* 120. 1 *Smith's Rep.* 252. 3 *Atk.* 518. 1 *Pow. on Mort.* 296. 2 *Pow. on Mortg.* 1072. As to *trustees,* the common law from the *earliest* times, down to the present day, has persisted in this principle. *How vs. Godfrey, Finch,* 361. *Bonithon vs. Hockmore,* 1 *Vern.* 316. *Scatterwood vs. Harrison, Moseley's Rep.* 128. *Robinson vs. Pett,* 3 *P. Wms.* 248. *Char. Corp. vs. Sutton,* 2 *Atk.* 406. *Ayliff vs. Murray,* 2 *Atk.* 52.

*Gould vs. Fleetwood,* 3 *P. Wms.* 351. *Amb.* 78. 4 *Ves.* 72 10 *Ves.* 184. *In re Ormsby,* 1 *Ball* & *Beatty,* 189. *Ham. Dig.* 641, *s.* 2, 3. *Highm. on Lun.* 70, 71. 1 *Cru. Dig.* 357, *s.* 42, 43, 44. 4 *Desau.* C. R. 368. *Green vs. Winter,* 1 *Johns.* C. *R.* 27, 37, 38, 43. *Manning vs.* Manning, 1 *Johns.* C. *R.* 527. *Mason vs. Roosevelt,* 5 *Johns.* C. *R.* 534, 540. *Munford vs.* Murray, 5 *Johns.* C. *R.* 1, 17.

8. On the *eighth* point. The complainants claim to charge *Tench* in all cases equally with his co-trustee, and if he exempts *Samuel,* he at the same time exempts himself. He is responsible for costs, as well as liable for all that may be decreed; so that he could not be examined even *de bene esse.* But as his interest in the event of the suit is now manifest, his deposition, if taken *de bene esse,* cannot be read; and if read is entitled to but little credit; as it is vague and unsatisfactory. They cited *Dixon vs. Parker,* 2 *Ves.* 219. *Bridgman vs. Green, Ib.* 629. *Downey vs. Townsend, Ambl.* 592. 2 *Eq. Ca. Ab.* 397, *pl.* 12. *Skin.* 673. *Murray vs. Shadwell,* 2 *Ves. & Bea.* 401, *(and note a.)* *Whipple vs. Lansing,* 3 *Johns. Ch. Rep.* 612. *Lee vs. Atkinson,* 2 *Cox,* 412. *Flodding vs. Winter,* 19 *Ves.* 196.

*Wirt,* (Attorney General of *U. S.)* *Jones, Taney,* and *Magruder,* for the Appellees in the *second* appeal, on the *fifth, sixth, seventh* and *eighth* points.

5. On the *fifth* point, as to the effect of the answers. Several of the credits claimed by the defendants are objected to, because there is no evidence (except their answer,) in support of them. It becomes of importance, therefore, to ascertain whether so much of the answers as the defendants rely on, be evidence for them. The bill of complaint calls upon the defendants expressly to "render a particular account of their transactions under said deeds of trusts." "Whether they have paid any of the debts due from the said *Thomas Ringgold,* and *state the same."* So much of the answers as the defendants would call to their aid, is strictly responsive to the bill. It is not necessary then to maintain the correctness of the ground taken by Chancellor *Johnson.* His opinion was, that if the complainants chose to make the defendants disclose on

oath any part of the transaction, they were bound to let the defendants disclose the whole. That the matter *in avoidance* of, as well as the matter *responsive* to the bill, was evidence for the defendants, if the matter in avoidance was matter strictly connected with the matter responsive. In this he evidently differed with Chancellor *Kent*, in *Hart vs. Ten Eyck*, 2 *Johns. Ch. Rep.* 62, who on the authority of a case in *Gilbert's Law of Evidence*, 45, decided, (not that matter strictly responsive to, but) that no matter in avoidance of the bill, could be evidence for the defendant. In the latter case it was simply decided, "that the defendant must make out by proof," (not what is responsive to the bill, but) "what was insisted on *by way of avoidance.*" The matter stated in the defendants' answers is not in avoidance, but purely responsive to the bill. Nothing which the complainant's bill demands of the defendant to set forth in his answer, can be called matter in avoidance. The defendants have no interest, therefore, in disputing the correctness of Chancellor *Kent's* decision. If they had, it might be said for them, that it appears by the index to 7 *Johns. Ch. Rep.* 75, pl. 11, that his decree was reversed; and it is a thing unheard of that the supreme court of one state should borrow its law from the inferior court of another state, whose decision had been reversed by its own superior court. Many of the cases cited only go to show that the Chancellors were disposed to agree with Chancellor *Johnson*, as to what *ought* to be the law; that the decision in *Gilbert* is so often productive of mischief, that it is desirable oftentimes, for the purposes of justice, to escape from its operation. The doctrine of that case, however, has been so long established, that it would be judicial legislation to overrule it. Yet it has not been longer settled, nor is it better known, or entitled to as much respect, as the rule for which we contend. "The general rule," (says Chief Justice *Marshall* in *Clark's Ex'rs. vs. Van Riemsdyk*, 9 *Cranch*, 160,) "that either two witnesses, or one witness with probable circumstances, will be required to outweigh an answer, *asserting a fact responsively to the bill*, is admitted." Yet the doctrine we have to combat, is that no witness is necessary to outweigh it; for that it is not evidence at all, unless perhaps the complainant is obliged

to rely upon it in order to make out his case. Widely different was the opinion of Chief Justice *Marshall.* He understood the rule, and reason of the rule. "The reason, (he adds,) on which the rule stands is this. The plaintiff calls upon the defendant to answer an allegation he makes, and thereby admits the answer to be evidence." If therefore there be but one witness in opposition to the answer, we have the oath of one man, and opposed to the oath of another, and the complainants' solitary, though disinterested, and it may be unexceptionable witness, will not outweigh the oath of the interested defendant. Such is the general rule of equity, founded when understood, in the strictest propriety. It is to be found in all the writers uniformly recognized and acted upon by learned chancellors, and yet to be questioned by any court of equity. "There is no principle," (says Chancellor *Hanson,* in *Hopkins vs. Stump,* 2 *Harr. & Johns.* 304,) "better established than this, that if a defendant be compelled to answer, whatever he says on oath shall prevail, unless refuted by the testimony of two witnesses, or of one witness with equitable circumstances." Such is the strong and conclusive language upon this point, of men whose opinions no judicial tribunal is at liberty to treat with disrespect. Such has been repeatedly declared to be the rule of equity by the former and present court of appeals of this state. Without alluding to others, in the case of *Jones vs. Sluby,* 5 *Harr. & Johns.* 373, it was explicitly admitted by this court that the answer, so far as it was responsive to the bill, was evidence, but declared to be only parol evidence. Surely the decisions of this court ought to be some evidence to itself of the law. But it is said that the defendants ought to have produced vouchers, and not to have relied on their own oaths. The answer to this is that it was not for the defendants to judge by which description of evidence they should establish their title to the credits which they claimed. The complainants were to make the choice for them, and they chose not to require the vouchers, which might deceive, but insist that they should be set forth in the defendants' answers, which were to be verified by their own oaths. Now suppose the defendants, in answering this bill, had omitted to state what debts had

been paid by them, but in answer to that part of the bill had
offered to produce vouchers in support of the credits to be
claimed by them, what might the complainants have done?
Precisely what they did do, with the first answer of *Tench
Ringgold*—excepted to it for insufficiency, and claim the state-
ment which was to be verified, not by vouchers, but by their
own oaths.    The complainants have a right to insist, that they
be furnished with proof of the several credits which the de-
fendants claim.    They do demand it, and it is furnished to them.
They now complain of the absence of other proof—proof for
which they did not call, and which of course they did not au-
thorise the defendants to produce.    Will it be pretended that
the defendants had a right to burthen this case with voluminous
records, judgments, decrees, bonds, with receipts in them, &c.
&c. when the complainants, who were to be the exclusive
judges of the necessity and propriety of calling for them, in-
stead of asking for vouchers demanded only of the defendants
to state in their answer "whether they have paid any of the
debts due from the said *Thomas Ringgold*, and *state the
same.*"    With respect to the disputed items, the charge against
the defendants for the negroes taken from *Prospect Hill*, is
conclusively refuted by several witnesses.    The credit claimed
by *S. Ringgold* for the money paid to *McMechen*, is establish-
ed by the testimony of *Tench Ringgold*.    Other proof could
have been obtained in support of the credits now disputed, if it
could have been surmised that they needed other vouchers.    With
respect to most, if not all of them, though disputed in this
court, they were admitted in the court of chancery.    The ac-
count, on which the complainants insist as the correct ac-
count, allows to the defendants the principal part of these
credits; and though their exceptions are not to be regarded as
exceptions here, yet they must be considered as assertions or
admissions by the complainants.    They then stated the exception,
which insists upon a particular account, and excepts to all other
accounts, so far as they are inconsistent with the above account.
They then turned to that account, and took from the credit
side such of the credits there allowed as disputed, viz. *McMe-
chen's* and *Wilmer's* claims.    The above exception, if, as it
is supposed, may be used as evidence against the complainants,

is a distinct admission that the defendants are entitled to those credits, and therefore need not offer proof of them. In addition to this there has been produced repeated settlements of the defendants' accounts with *T. Ringgold*, and admissions by him that they were correct, and that they are entitled to the credits which they now claim. Surely he who created the trusts, declared the purposes for which they were created, and was himself a *cestui que trust*, had a right to examine the accounts of the trustees, and to approve of them. And his admissions ought to be some evidence of the correctness of the payments made by the trustees. If rejected, as claims on the trust fund, because others were interested with him in that fund, they are to be allowed in the settlement of that part of the estate—the *chose in action*, &c. which never constituted any part of the trust estate, but still remained his own, yet to be disposed of as he pleased, and answerable for any debt of whatever description he might admit. On this point they also referred to *Blount vs. Burrows*, 4 *Bro. Ch. Rep.* 75. S. C. 1 *Ves. jr.* 546. *Kirkpatrick vs. Love*, *Ambl.* 589. *Snellgrove vs. Baily*, 3 *Atk.* 214. *Doyle vs. Blake*, 2 *Sch. & Lef.* 243, *Lady Ormond vs. Hutchinson*, 13 *Ves.* 51. *Green vs. Hart*, 1 *Johns. Rep.* 580. *Hart vs. Ten Eyck*, 2 *Johns. Ch. Rep.* 93, *(note.)* 1 *Fonbl.* 179.

6. On the *sixth* point. Whether the decree should be enhanced from simple to compound interest? This question has been fully argued on the *third point*. It is settled law that these trustees are not chargeable with any breaches of trust, not charged in the bill. *Smith vs. Smith*, 4 *Johns. Ch. Rep.* 281. It is not charged in either of the bills that there was any delay in paying debts, or in bringing *Maund's* affair to a final decision. *James vs. M'Kernon*, 6 *Johns. Rep.* 543. Where a trustee makes profit, and will not give an account, he is chargeable with compound interest. *Evertson vs. Tappen*, 5 *Johns. Ch. Rep.* 498, 517. Where the deed creating the trust directs an investment of the interest, which is not done, then compound interest is charged. *Raphael vs. Boehm*, 11 *Ves.* 92. S. C. 13 *Ves.* 407, 411. *Durne & Gassaway vs. Catlett*, 6 *Harr. & Johns.* 475. In *Rocke vs. Hart*, 11 *Ves.* 58, the money was used by the executor in the course of his trade; and

yet only equitable rate of interest of 4 per cent. was allowed. In *Young vs. Combe,* 4 *Ves.* 101, there was an express violation of the trust. The executor had the money in hand, and it was his duty to invest. Only 4 per cent. was allowed. In *Newton vs. Bennett,* 1 *Bro. Ch. Rep.* 362, the executor kept the money without accounting, but employed it in his trade. Simple interest only was allowed. The note in that case shows that the only question was as to 4 or 5 per cent. not compound interest. Where gain is made the trustee is to account for the gain, or pay 5 per cent. interest. *Mosley vs. Ward,* 11 *Ves.* 581. The case of *Forbes vs. Ross,* 2 *Bro. Ch. Rep.* 430, was a case of fraud. They also referred to and commented on, *Perkins vs. Baynton,* 1 *Bro. Ch. Rep.* 375. *Treves vs. Townshend, Ibid* 384. *Piety vs. Stace,* 4 *Ves.* 620. *Ashburnham vs. Thompson,* 13 *Ves.* 402. *Crackel vs. Bethune,* 1 *Jacob & Walker,* 566. A contract to account for compound interest is void. Where it is allowed, is a relaxation of the general rule. 1 *Ball & Beatty,* 430. *Waring vs. Cunliffe,* 1 *Ves. jr.* 99, *(and note.) Ex parte Bevan,* 9 *Ves.* 223. *Connecticut vs. Jackson,* 1 *Johns. Ch. Rep.* 13. *Barrow vs. Rhenelander, Ib.* 550. *Van Benschooten vs. Lawson,* 6 *Johns. Ch. Rep.* 313. *Darne & Gassaway vs. Catlett,* 6 *Harr. & Johns.* 475. Compound interest is allowed in certain specified cases of mortgages, &c. *Perkyns vs. Baynton,* 1 *Bro. Ch. Rep.* 574. *Creuze vs. Lowth,* 4 *Bro. Ch. Rep.* 157, 316. *Raphael vs. Boehm,* 13 *Ves.* 590. This last case was an innovation upon the general doctrine. The direction there was to invest the interest to accumulate for the benefit of the trust. *Treves vs. Townshend,* 1 *Cox's Cas.* 50, *(note 2.)* S. C. 1 *Bro. Ch. Rep.* 384. *Tebbs vs. Carpenter,* 1 *Madd. Rep.* 290. *Dornford vs. Dornford,* 12 *Ves.* 127. In the most aggravated cases no compound interest was allowed. *Hall vs. Hallett,* 1 *Cox,* 134. *Crackel vs. Bethune,* 1 *Jac. & Walk.* 566.

The detainer of one trustee does not make his co-trustee answerable for interest, unless the money is placed in the hands of his co-trustee out of the line of the trust, or with knowledge that his co-trustee is not trust-worthy, and who applies the funds, not for the purposes of the trust. Is the case open in this point? Or indeed is compound interest before the court?

The instructions by complainants to the auditor. The auditor's statement was to be made, subject to exceptions. No exception by complainants to the auditor's statement. They are now precluded from excepting. They affirmed the auditor's statement, and now they wish to except. *Wilkes vs. Rogers,* 6 *Johns. Rep.* 566, 591.

[BUCHANAN, Ch. J. Very soon after the constitution of the present court, it was decided that the auditor's report, to which there had been general exceptions, or where there had been special exceptions, or where there had been no exceptions taken to it in the court below, might be excepted to in this court, and the whole accounts gone into.]

7. On the *seventh* point. Although a commission is not allowed, yet a substitution, by way of compensation, is allowed to trustees. *Ellison vs. Airey,* 1 *Ves.* 115. *Brown vs. Litton,* 1 *P. Wms.* 140. *Chetham vs. Audley,* 4 *Ves.* 72, *(and note.)*

8. On the *eighth* point. Although in general a co-plaintiff cannot be examined, yet a co-defendant may be examined in a matter in which he is not concerned. *Brid. Ind.* 659, pl. 2, 3; 660, pl. 12, 13, 14. Here *Tench Ringgold* cannot be interested; for he is defaulter, and the attempt is to charge *Samuel,* who is a creditor to the trust. So that whether *Samuel* is to be prevented from the credit in paying the debt to *M'Mechen,* is of no sort of consequence to *Tench,* as it will neither make him pay more, nor less, if the decree is against him. *Murray vs. Shadwell,* 2 *Ves. & Beames,* 404, 405.

ARCHER, J. delivered the opinion of the Court. This cause is one of great magnitude and interest; of magnitude, in relation to the amount involved in its determination, and of interest, not only on account of the principles connected with its decision, but of the peculiar relations in which the parties concerned stand to each other. On the one side, the complainants are the widow and children of one, whose infirmities and dissipated habits were, early in life, involving in ruin and entanglement a large patrimonial estate, and who gave sure indications that, in a short time, he would reduce to poverty his wife and family. On the other hand, the respondents are the uncles of the com-

plainants, who, observing the unfortunate habits of their brother, generously stepped in between him and his tottering fortune, and took upon themselves the onerous duties of trustees of his estate. After a period of twenty-four years, they are presenting to this tribunal an account of their stewardship, which has been demanded by the widow and children of their brother.

After a laborious discussion of the very eminent counsel concerned for the parties, we have approached the examination of the multifarious and perplexed transactions which have grown out of a trust of such duration, with an anxious solicitude to arrive at truth, and by applying the law to ascertained facts, to reach the justice of the case. Courts have very frequently painful duties to perform; and although they cannot be blind to the consequences which may flow to individuals from their decrees, yet insensibility to them is a stern mandate of judicial duty.

We do not deem it necessary for the purpose of this decree, to recapitulate the proceedings and numerous facts in the record; they will, perhaps, be found to be sufficiently stated in the auditor's report and in the chancellor's decree. The cross appeals will, for the purpose of this opinion, be considered as consolidated; and we shall proceed to present our views of the various questions which have been raised in the discussion by the counsel on either side.

The court conceive that the trustees are accountable for the value of *Hopewell*. In the view which we take of this subject, so far at least as concerns this question, it is immaterial to inquire, whether the transfer of this estate was made under the deed of 1798, or of 1807; for, in either view, they were not authorised to transfer that estate except by a sale. If it were considered as coming under the provisions of the deed of December 1807, its terms are too explicit to need illustration. As it regards the deed of 1798, they were authorised to sell the whole or a part of the real estate *on credit*, or for cash, and the surplus, whether consisting of real estate, bonds or money, was to be applied as is therein directed. It has been contended, that the trustees under this deed had authority to make the exchange of *Hopewell* for the *Ferry property* on the *Susquehanna*, because the deed contemplates a surplus of land re-

maining on hand after the objects of the deed are gratified. The trustees might, in their discretion, only sell a part of the real estate, and the part in that event remaining in their hands, would have been a *surplus* over and above what was necessary to effectuate the objects of the trust. The argument would have been entitled to more weight, had the direction been to sell the whole estate. The sale of *Hopewell*, was not only a violation of the express stipulations of the trust, but was known and acknowledged to be so by the respondents. The deed for the ferries, from *Richard S. Thomas*, was given to them in their individual characters, and not as trustees, and the reason for this procedure, as is deducible from the complainants' *exhibit B*, is, that they had no right, by the terms of the trust, to take the ferries in exchange. In this transaction they *both co-operated*, and although they may have acted with the best intentions, and with the most honourable views towards their *cestui que trusts*, this court must hold them jointly responsible, unless by the various acts of sanction which have been given by *Thomas Ringgold*, they shall appear to have been justified. Apprehending, indeed, responsibility growing out of this transaction, the trustees, if they did not seek indemnity for this contract, accepted a bond from *Thomas Ringgold* reciting his original assent to the exchange, and binding himself to save them harmless; and on the same day on which the bond was executed, as if the more surely to guard them from anticipated responsibility, he made his last will and testament, in which, as far as he could, he attempted a ratification of this transaction. This instrument, although its expressions are general, has an undoubted allusion to this contract alone, for no other sales of real estate are alleged to have been made, which needed ratification. These instruments were executed nearly four years after the execution of the deed of December 1807, by which he transferred all his land, negroes, stock and farming utensils to the trustees. His habits of inebriety are represented by the testimony before us to have been confirmed, and to have greatly debased and debilitated his mind. He was either placed, or believed himself to be placed, in a condition of the most abject dependence on his brothers, for even the most common necessaries of life. He had clear and unquestionable rights,

as one of the *cestui que trusts* under the different deeds of trust, which secured to him in all probability, an ample independence.   Yet, instead of manifesting any desire to enforce those rights, as his necessities might require, his letters rather represent him in the condition of a pennyless dependant on their charity and bounty.   The relation existing between a trustee and *cestui que trust*, the policy of the law requires, should be guarded with vigilance by a court of equity—contracts between them should be scrutinised, that no injustice should be done the *cestui que trusts.*   It is true, these various acts of attempted indemnity do not, in relation to the transactions to which they have reference, or from their character as manifested on the face of them, bear any striking evidence of legal inefficiency.   It might not have been inconsistent with those great principles of moral duty, or just liberality, which one brother might owe to another, to grant indemnity for acts, which, though injurious in their consequences, he might have believed proceeded from the purest motives.   But a court of equity ought to be perfectly satisfied, that he was free to act as a rational intelligent man, that he was not governed by considerations growing out of a dependant condition; and in this case there is too much reason to believe, not only from his letters, but from his general character and conduct, as detailed by the testimony, that the considerations above alluded to, entered largely into the motives for executing these instruments.

The responsibility of the respondents growing out of this contract, having been determined, it is necessary to ascertain the price with which they should be charged.   The *cestui que trusts* are entitled, upon every principle of equity, to the full value of the lands at the time of the sale.   The trust has been violated, the title to the lands disposed of contrary to the express injunction of the instrument under which they act, and there is no possible means by which this court can reinstate the complainants in their interest, but by charging the trustees with the utmost value of the property.   This is the principle adopted in the case of a mixture or confusion of property, and the ground of it is, that although the trustee may be injured by its application, yet the *cestui que trusts* are certain of indemnity; and it would be but just, that if, in the impossibility growing

out of the conduct of the trustee of ascertaining the actual value, injury should probably result, it should rather fall on him whose conduct had been delinquent, than on the innocent *cestui que trusts.* Yet, *where the value of the property can be clearly ascertained, that must be the measure of indemnity.* But for the circumstances which preceded and followed this sale, we should have been compelled to fix the value of these lands, from the opinions and recollections of witnesses, of the state and condition of the property, and what it would have sold for in 1807, and for this purpose, the depositions of *Mr. Thomas, Mr. Worrell* and *Mr. Barroll,* would have been sufficient; but the record furnishes us with the evidence that these lands were advertised for sale; that the sale was attended by many persons of property; that the lands were examined by several who were considered as desirous of purchasing, and who were able to have become the purchasers: yet, that when it was set up, a greater price could not be obtained than $16 per acre, and that the trustees bought it in for the estate, at that sum, and afterwards actually agreed to sell it to *R. S. Thomas* for that price, and even he refused to execute his contract. These facts furnish the best evidence, that the lands did not exceed the value of $16, and greatly outweigh the opinions of witnesses, as to its value, given many years after it was thus publicly offered. If the land had been more valuable, it would surely have been bid for at a greater sum, when it was thus offered under such favourable circumstances. Nothing can be deduced of the value of *Hopewell,* from the price which was fixed on it in the deed from the trustees to *R. S. Thomas*—this was done in consideration of the exchange—*Thomas,* whose experience made him better acquainted with the ferries, was anxious to dispose of them, and probably anticipated some of the losses and inconveniencies which subsequently attended them; although he was unwilling to give $16 an acre for *Hopewell* in cash, yet, if the ferries were taken in part, he was willing to give a much greater sum. This only shows his anxiety to rid himself of the ferries, and not that *Hopewell* was, even in his estimation, worth more. The court, therefore, think the chancellor erred in charging the value of *Hopewell* and *Chester-Town* property at $25,000.

The amount due from *Tench Ringgold* for the sale of the

332½ acres of the *Washington* lands, has been also one of the subjects of controversy. It has been contended by the respondents, that these lands were sold by *Thomas Ringgold* before the execution of the deed of trust of October 22d, 1798, and that having been so sold, they were not conveyed, or intended to be transferred by that instrument, and were not a part of the trust property; and this is emphatically stated in the answers of the respondents; and in the letters of General *Ringgold* to Mr. *Brice*, exhibited by the complainants, he regrets it as a misfortune, that the lands were sold by *Thomas* before the deed of trust was thought of; and it is said that one of the complainants, *James G. Ringgold*, acting for himself, and as agent and solicitor for the other complainants, has admitted the fact. But whatever may be the strength of this testimony, it is not warranted by the exhibits and evidence in the cause. By *exhibit S. R.* No. 1, *Samuel Ringgold* charges himself as trustee with the receipt of part of the purchase money of these lands; this account constitutes a part of the answer, as much so as any express averment in it; and in *Tench Ringgold's* exhibit, which also constitutes a part of his answer, it is said, that on the 21st of November, 1798, a settlement took place between *Tench* and *Thomas*, and assented to by *Samuel*, by which it appears that *Thomas Ringgold* is charged with the legacy due *Tench*, with interest up to the 6th of March, 1799, which shows, that until that period the legacy was unsatisfied, as it could not have been if a sale had taken place before the deed of trust. These inferences and facts are strongly supported too by the evidence furnished by the deed of October, 1798, itself; that declares on its face the indebtedness of *Thomas* to *Tench*, and one of the first objects of the trust there created, is the satisfaction of the legacies due from *Thomas* under his father's will, (the legacy to *Tench* being one) by the sale of the lands. This instrument does, therefore, entirely *negative the idea* that a sale of these lands was made before the execution of that deed. But if *Thomas* had agreed to sell the lands to *Tench*, the legal estate in the *Washington* lands, with the amount due thereon, passed to the trustees, and it was unquestionably the duty of *Samuel* to collect the purchase money and convey the property. The

deed of the 27th of May, 1799, from *Thomas* and *Mary Ringgold* to *Samuel* and *Tench Ringgold*, instead of impugning the idea of a sale by the trustees, is calculated to confirm it. If the *Washington* lands were not trust property, and did not pass by the deed of 1798, why was this deed executed to *Tench* and *Samuel?* Would he not have been more likely to have himself coerced the payment from *Tench,* and conveyed it to him, had he personally sold it to *Tench,* and retained the title? Instead of this, he joins his wife in a conveyance to *Samuel* and *Tench,* which is in entire inconsistency with the idea of a previous sale by him. The object of this deed was undoubtedly to pass to the trustees the dower of *Mrs. Ringgold,* that *Samuel* might be enabled to give an unincumbered title to *Tench,* when the purchase money should have been paid by him to *Samuel.* In any light in which this transaction can be viewed, a joint responsibility grows out of it. If the estate passed by the deed of 1798, there was a breach of trust in *Samuel* in selling to his co-trustee, which would make him responsible; and if contracted for by *Thomas* with *Tench,* before the execution of that instrument, it still passed the legal estate to the trustees, and it was *Samuel's* duty to have collected it; and having not only failed to do so, but having made no effort for this purpose at any period of the existence of the trust, but suffered it to lie in his hands when he knew the trust was abused, in consequence of a failure on *Tench's* part to apply the amount of this purchase money to the payment of the debts of *Thomas Ringgold,* he has clearly made himself responsible equally with his co-trustee.

The joint responsibility of the respondents for the sale of the personal property in November, 1807, on the *eastern shore,* is a question which has also been submitted to the consideration of the court. The bill charges the trusts under the deeds of 1798 and 1807, and the answers of the defendants admit the trusts confided to them; and in their various exhibits, which are made parts of their answers, they return accounts of their sales of the personal property as made under these deeds. It seems to have been considered by the trustees, as far as the evidence in the cause will enable this court to judge, that the trustees conceived they had power, under the deed of 1807, to sell the per-

sonal property which was disposed of by them, from *Hunting-field* and *Hopewell*. But it is very clear, that a deed made on the 18th of December, 1807, could transfer no right to property which they had sold on the 27th of the November preceding. *Thomas* Ringgold, at that period, had no interest to convey. *Samuel* and *Tench* had sold it all previously to various purchasers, in his presence, or with his express approbation, at a time, too, when he had, for aught that appears in the cause, a complete right to it; for by the deed of 1798, no personal property was conveyed, and we cannot notice the deed of January 1807, as it is not evidence in any manner in this cause. It is very probable that these sales were all made in anticipation of the deed of December, 1807, which was to follow, and did follow a few days after the sales. That *Samuel* and *Tench* were trustees of this property, must be inferred from all the evidence. They exercised dominion over it; they sold it with the assent of *Thomas;* they took bonds from the purchasers in their own names; they collected a part of the purchase money, and they have proffered themselves ready to account for these sales, and have made a return thereof as having been made by them as trustees. These sales not being then within either deed of trust, must have been made under some conventional arrangement, either verbal or written, which is not before the court, and which is only to be inferred from the transactions of the parties. That such a trust may be asserted and enforced in a court of equity, cannot be questioned. But the difficulty on the part of the complainants, arises from the circumstance, that there is no allegation in the bill which covers or affects any other trusts than those of October, 1798, and of December, 1807. A court cannot be aided in the construction of any agreement by the acts which the parties may have done under it, nor is a party bound by any construction which he may have put upon the instrument. The answer, therefore, which presents a list of the negroes and specific articles of personal property sold on the *eastern shore*, also discloses the fact that the sales were made anterior to its execution, and the evidence confirms the answer in this respect. Had these sales been actually made in anticipation of the deed of 1807, and resting on the agreement of the parties that they should be confirmed by that

instrument, and that their responsibility for the proceeds of these sales should be governed by its stipulations, which we have no doubt from the evidence was the fact; had some verbal or other trust existed under which they were made, or had *Samuel* exercised dominion over the property after the execution of the deed of January, 1807, and proceeded to sell the property as trustee in virtue of its stipulations, as if it had been a valid and operative transfer, and had under these circumstances joined *Tench* with him as agent, or associated him as a cotrustee with the assent of the parties, in anticipation of a deed of trust subsequently to be executed, it was surely important that each or all of these facts, as the truth might warrant, should have formed substantive allegations in the bill; or if either fraud or mistake had given the deed of December, 1807, the shape which it now assumes, contrary to the understanding and agreement of the parties, that should also have been averred. A court of equity must always decree upon the allegations of the complainants. It is never justified in going beyond them. Such a course would violate the fundamental principles of pleading, and would work a surprize on the respondents. Had the respondents admitted a sale under these deeds, without disclosing the fact of the anterior sales, it might be well questioned whether what had been thus in pleading explicitly admitted, could be contradicted by the adduction of evidence on their part, showing that the sales were anterior to the deed. But having averred the sales previous to the deed, although they state that the sales have been made by them as trustees, they are not estopped and precluded from demanding whether a legal responsibility grows out of the deeds of trust for sales previously made by any just construction thereof. We are therefore of opinion, that in this cause, whatever under other circumstances might be the right of the complainants' demands against the respondents as trustees for sales of the personal property on the *eastern shore*, this court, in the state of these proceedings, cannot decree against them for the amount of those sales. In this respect, the rights of the parties are reserved for the future consideration of a court of equity, should the complainants deem that their interest demands an investigation.

But although the sales of the personal property cannot be covered by any allegations in the bill, this court, in this proceeding, will do equity between the parties as far as is consistent with the established principles of chancery proceedings. It appears from the evidence in the cause as furnished by the answers of the defendants, (see their various accounts filed as exhibits to their answers,) that *Samuel Ringgold* has received the sum of $1,117 83, part of these sales, and that *Tench Ringgold* has received the residue from the different purchasers. *Samuel Ringgold* has applied the sum thus received to debts of the estate, and *Tench Ringgold* has paid debts and made disbursements to a considerable amount after the sales of the personal property. We shall therefore consider, so far as *Tench* has, *after the sales of the personal property*, paid debts and made disbursements for the estate of *Thomas*, that they were made from such receipts. For all the residue of *Tench's* receipts, which will be unexhausted by such an application, and for the amount of his own purchases at the sales of 1807, all of which remains uncollected, accountability must be sought by the complainants in a new proceeding. We conceive from the evidence in the cause, that although these sales were not within the terms of the trust of 1807, charged in the bill, yet they were in their hands as trustees for the payment of debts, as well as the property actually passing by that conveyance, and being so, and their accounts showing generally that debts were paid without designating out of what trust fund particularly they were paid, that for the purpose of effectuating justice between the parties, we have a right to consider that the debts and disbursements after the sales of 1807, were paid by each trustee to the amount of actual receipts by each from these sales, out of the money received by them from such sources.

We consider the respondents as properly chargeable for the amount received from *Thomas Ringgold's* securities. These securities amounting to the sum of $8,191 47 were received in the years 1799, 1800, 1801, 1803, and 1805, as appears by the accounts exhibited and receipts offered in evidence. The complainants allege, that at the time of the execution of the deed of trust of 1798, authority was given by *Thomas Ringgold* to the respondents, to collect all debts due to him, (to be

applied to the payment of his debts, and that in virtue of such authority, large sums of money were received by them) and they pray an account thereof. This allegation is not directly answered, otherwise than by their exhibited accounts, and by testimony from which it appears, that outstanding debts at that time, due to a large amount, were by them collected as trustees. These facts justify us in saying that such authority was given, and that they acted in regard to them as joint trustees.

These respondents are also chargeable with the rents received for the lands of *Thomas Ringgold.* The legal estate passed in these estates to the trustees by the deed of 1798. They were rented out and the rents received, and should have been applied to the purposes of the trust.

The subject of interest forms a very important item in the controversies between the parties—the respondents insisting that interest ought not to be charged against them, while the complainants contend, that they should be allowed compound interest, or if not, that the chancellor has erred in allowing a rest of six months from the receipt of monies by the trustees free of interest.

As it regards the balance due from *Tench* for the *Washington* lands, there can be no pretence for exemption from interest; he was to pay for them at a stipulated period and has failed to do so; and it having been determined that there is a joint responsibility for the principal, there is, of course, a joint responsibility for the interest.

As it regards the receipts of *Tench* between the execution of the two deeds of trust, which were not applied by him to the payment of debts, it may be remarked that it was his duty to apply them to such outstanding claims as were then due from the *cestui que trust,* or if he had detained them, to have met the outstanding judgment of *J. J. Maund,* to have placed those monies in a situation where they could never have met with those accidents to which every individual's fortune may be liable. He should at least have shown us, that the funds were kept separated from the mass of his estate. Could this have been done, this court would have been disposed to shew the utmost indulgence. The pressing character of the outstanding debts, could not but be known during this period of *Samuel,*

for he was, during the most of this time, advancing from his private estate to meet them; yet he makes no effort to obtain the funds in *Tench's* hands to be applied to these objects.   He must have known that *Tench* had funds; for he was permitted to collect debts on the *eastern shore*, and if he did not know, he was surely bound to know and to watch over the conduct of his co-trustee.   Upon such sums, they must be conjointly charged with interest.

For the amount due from them on account of the *Hopewell estate*, they are certainly chargeable with interest.   That they invested it in property unproductive, can furnish no ground for exemption, because they acknowledgedly transcended their power and violated their legal duties and obligations.   We must consider them as having the value of this estate in hand at the time of the sale; and the reason assigned for the previous liability, will apply to them in this particular, if the sales were even made under the deed of 1798, where the obligations of the trustees to pay interest is not so entirely clear and apparent as under the deed of 1807.   But the sale may and ought to be considered as made under the latter deed.   It is true, the contract of sale was made before, but they derived their power and authority to perfect it under the deed of 1807, for that conferred the power to pass it free from the incumbrance of *Mary Ringgold's* dower; and the title of *R. S. Thomas*, was in fact, made and perfected after and under that instrument, the conveyance to *R. S. Thomas*, having been made in 1808.   Now, what are the stipulations of the deed of December 1807, so far as they relate to the present question?   "That the *whole estate* thereby conveyed, should be immediately sold, and after paying all the just debts of *Thomas Ringgold*, the proceeds should, as received, be invested in government, bank, or turnpike stock, and the interest or dividends to be paid in the proportions therein mentioned; part to Mrs. *Ringgold* during the joint lives of herself and *Thomas;* part to *Thomas* during his life, and part to be applied to the support and education of the children of *Thomas* and *Mary, yearly* and half-yearly, as the same may be received; and that, until the proceeds of the sale shall be invested in stock, the *interest* arising therefrom, shall be paid and applied, when and as it is received in the proportions therein designated,

to the *cestui que trusts.*" Having the proceeds of this estate in hand, it was their imperative duty to have invested unless a portion, or the whole of them, had been demanded by acknowledged debts of *Thomas Ringgold.* The deed was intended as a family provision, and the debts then outstanding, except *Maund's* judgment, were inconsiderable. By transferring the legal estate to the trustees in all this property they placed their dependence upon its productiveness in their hands for a support. They parted with the income which it furnished in consideration, and evidently under the expectation, that it would be immediately invested. It had been represented nearly a year prior by one of the trustees, that the estate was nearly disencumbered of debts, and hopes were entertained that *Maund's* claim, which was then depending in court, would be perpetually enjoined. It had been litigated at that period for several years and no reasonable expectation could then be entertained that it would be very speedily brought to a close. Under these circumstances, would the trustees have been justified in laying by the money and patiently waiting for the event of a protracted chancery suit; the debt daily growing larger by accumulating interest, the funds remaining idle and stationary, and the family suffering for want of the means of subsistence, depending on the charity of their relatives? It never could have been the intention of the parties, that the investment in stocks should await the determination of *J. J. Maund's* judgment; or that the family should for a moment be left without support, for the interest on the sales are directed to be paid them until the funds are invested; thus, looking to a constantly accruing interest, and negativing every idea of any intended permission, that they should lie idle for such a purpose. Had the money then remained in their hands, they would have been grossly negligent in not investing it. In such a case the rule is settled, that trustees are chargeable with interest. *Treves vs. Townshend,* 1 *Brown's Ch. Rep.* 384. *Rock vs. Hart,* 11 *Ves.* 58; and the rule, Chancellor *Kent* declares to be founded in justice and good policy, as tending both to prevent abuse and indemnify against negligence. *Dunscomb vs. Dunscomb,* 1 *Johns. Cha. Rep.* 504, 508.

Where the trustee is directed to invest funds and to reinvest

the dividends, or interest, or in other words, where the trust directs an accumulation, and the trustee has used the funds, compound interest will be allowed, as was done in the case of *Raphael vs. Boehm*, 11 *Ves.* 92, 108, 109; and S. C. 13 *Ves.* 407, 590; or where he has used the trust money, or employed it in his trade or business, he shall also be charged in the same manner as was decreed in *Schieffelin vs. Stewart, and others*, 1 *Johns. Cha. Rep.* 620. The grounds of this allowance, as is apparent from these cases, is founded on the gain or presumed gain of the trustees, and that the *cestui que trust*, may be indemnified by the efforts of the court in this way, to reach their profits or presumed profits. But, in this case, although the *cestui que trusts* could not, perhaps, be indemnified by a less allowance than compound interest, yet the circumstances forbid the presumption of a gain on the part of the trustees: although the investment was in violation of the trust, it was done doubtlessly with the best intentions; with no views whatever, of reaping from the transaction, any benefit to themselves, but declaring that the profits, whatever they might be, if any, should be for the benefit of the trust estate. Believing such to have been their motives and views, public policy forbids that courts of justice should pursue a course which would have a tendency to deter persons from accepting offices frequently so necessary for mankind.

The trustees have been allowed on the authority of the case of *Dunscomb vs. Dunscomb*, 1 *Johns. Cha. Rep.* 510, a rest of six months without interest on their receipts. This is allowed as a reasonable time within which to pay or invest the funds. There would be great reason in the rule, had they actually invested or made efforts to invest; but in this case no dispositions were ever manifested to make such an application of the money as the trust contemplated. Debts due from the estate, were in many instances accumulating interest with the addition of costs, while funds were suffered to lie idle in the hands of one of the trustees, or were diverted to objects of expenditure foreign to the trust. To allow this rest, would in our opinion be doing injustice to the *cestui que trusts*.

Part of the account of *Simon Wilmer*, together with many other charges against the estate, were allowed by the auditor in

his accounts, and sanctioned by the Chancellor's decree, for which no vouchers were produced, and these allowances have been made the respondents from the statement in their answers alone, by which they represent these disbursements to have been made. The general rule that an answer responsive to a bill, is evidence for a respondent, is a well established and settled principle. But, the answer of a defendant, where it asserts a right affirmatively in opposition to the plaintiff's demand, is not evidence. *Beckwith vs. Butler*, 1 *Wash.* 224. *Payne vs. Coles*, 1 *Munford*, 373. An answer will not support a matter set up in avoidance or discharge where the matter of avoidance is a distinct fact. In such case, the defence must be proved. Mr. *Evans* in his appendix to *Pothier on Obligations*, 157, lays down the following principle: That where the answer is replied to, the whole is put in issue, and the defendant must support by proof, all the facts upon which he means to insist, while the complainant may rely upon *every fact admitted*, which he conceives to be material, without being bound *to the admission of others;* and this rule he deduces from a case cited in *Gilbert*, 51, which, as it is a leading case, it will be necessary to notice. There, the defendant, by his answer, which was put in issue by the complainant's replication, admitted as executor, that the testator had left £1100, and said, that afterwards, the testator gave a bond for £1000, and the testator gave him the other £100; as there was no evidence but the defendant's admission for the receipt, it was contended that he ought to find credit when he swears to his own discharge; but it was resolved by the court, that when an answer was put in issue, what was *confessed and admitted need not be proved,* but that it behoved the defendant to make out, by proof, what was insisted upon by way of avoidance. Chancellor *Kent* declares that this rule is well settled in chancery proceedings, and recognizes and adopts it in the case of *Hart vs. Ten Eyck,* 2 *Johns. Ch. Rep.* 62, where all the learning on this subject is ably collected and reviewed, and where it was determined that on a bill to account, the answer is no evidence of disbursements. The cases above cited from *Washington* and *Munford's Reports,* were also bills in chancery against executors to account, and where discharges alleged in the answers were held

to be of no avail unless supported by proof. The doctrine may then be considered as settled, that on a general bill to ac-count, the answer is no evidence of disbursements, notwithstanding it is said that the Court of Errors of the State of *New-York*, overruled on appeal the judgment of Chancellor *Kent* on this question. 7 *Johns. Ch. Rep. General Index,* tit. *Evidence,* 75, pl. 11.     That tribunal, from its peculiar structure, does not appear to be calculated for legal investigation, and its judgments cannot outweigh the opinion of Chancellor *Kent,* fortified as it is, by numerous cases of established authority. But, it is said, there being a call here for the amount of disbursements, and debts paid, that this case is varied from those which have been cited. It is true, there is, from aught that appears, a variance in form, but there is none in substance. For, a prayer that the defendant shall account, *is* in effect a call on the defendant, to state in his answer, not only his receipts, but his disbursements, so that the complainants may have an opportunity of putting them in issue; and without which, indeed, the defendant himself could give no evidence of them. Nothing more is demanded in the interrogatories in this bill, than, under a general call to account, the defendant would have been obliged to answer. It *is* nothing more *in* either case, than a demand on the defendant to show his receipts and the legal evidences of his expenditures, in conformity with the trust. Nor is there any hardship in the rule. Men of ordinary care preserve the evidences of their payments, and to say that the respondents should have done it, is demanding from them nothing extraordinary or out of the usual course of human transactions.

The establishment of a contrary doctrine would lead to dangerous consequences, and would be calculated to render trusts valueless, by giving to trustees, executors and guardians, the power on their own oaths, to exempt themselves from all responsibility. The rule then may be stated, (and it is the good sense of all the cases cited in the argument,) that in all cases where a complainant seeks a discovery and relief, and to make out his case, applies himself to the conscience of the defendant, if, in his answer, the liability is once admitted, there can be no escape from it but by proof. It is true, every thing which he says, with regard to the creation of that liability, must be taken

together; detached sentences cannot be used against him, but every thing which he says, relative to his original liability, is properly in evidence. This doctrine will be found to be supported in *Lady Ormond vs. Hutchinson*, 13 *Ves.* 53, 54, and by the cases above referred to.

The complainants, by their supplemental bill, seek to make the respondents accountable for nine negroes, taken by *Samuel Ringgold*, at the stipulated price of $2000. The answer of *Samuel* admits that they were so taken, but denies accountability, as they were taken at a valuation, in part payment of large sums of money, paid and advanced by the respondent, to *Thomas Ringgold*, and that a balance is still due him, of upwards of $3500. *Samuel Ringgold*, in *Exhibit* No. 1, filed with his answer to the original bill, has charged *Thomas Ringgold* with the payment to *D.* and *W. M'Mechen* of the sum $3574.

The court are of opinion, that the respondents cannot be charged with the valuation of these negroes. It is in evidence, that *Thomas Ringgold* admitted, that they were taken in part satisfaction of a debt, due from him to *Samuel*, in the year 1806; at a time, when from aught that appears in evidence, he was exercising dominion over his personal estate, and when no deed of trust, which the court in this cause can notice, covered it. As it regards the sum of $3574, which *Samuel Ringgold* claims credit for, the court deem it unnecessary, in pronouncing their judgment, to recapitulate the testimony of the various witnesses, who have been examined on the subject. Nor do they deem it necessary to determine the question, as to the competency of *Tench Ringgold's* testimony, for it is considered, that there is enough in the record without it, to justify the allowance.

It is contended, that this court is not competent to allow commissions, as a compensation to the trustees for their trouble. In *England*, a liberal indemnity is allowed to trustees for their expenses, but nothing as a compensation, unless founded in positive agreement between the parties. This rule appears to be applicable, not only to trustees of every description, but to executors. They are considered as confidential offices, gratuitously undertaken from motives of friendship or humanity, and

without views of personal benefit or profit. Yet, the *English* courts grant *per diem* allowances, not in the nature of a *compensation*, but under the name of an *indemnity*. The difference then, in truth, is only in the mode of allowance, not in the principle. It is in fact, a mere difference in name. Commissions in a case like this, might very fairly be considered as only extending a just and reasonable indemnity for time bestowed in the management of the concerns of others. But if, indeed, there was a difference in principle, this court would feel themselves justified in granting reasonable commissions. Our statutes allow commissions to executors, administrators, guardians and trustees, under judicial sales, and by analogy to these statutes, or by an equitable construction of them, the allowance may, and ought to be made in this case. But, although the general claim to commissions is admissible, we conceive that none should be allowed for the sale of *Prospect Hill*. The trustees have paid *N. Brice*, their agent, the only commissions to which they were entitled on this sale.

By the will of *Mary Ringgold*, bearing date in October 1803, certain legacies were bequeathed to *Samuel* and *Tench Ringgold*, in trust for *Thomas Ringgold*; with these legacies the respondents have charged themselves in their account accompanying their answers, but have, at the same time, referred to the source from which they emanate. There is no allegation in the bill of complainant or supplemental bill, which reaches this trust, and they cannot in this proceeding, be charged with them, either jointly or severally, but the equity of the complainants, in respect thereof, is reserved.

The court have appointed an auditor for the purpose of stating an account between the parties, upon the principles contained in this opinion, and will direct, that his costs shall be taxed in this proceeding. From the account thus audited, it appears that the sum of $39,318 54, with interest on the sum of $28,576 87, part thereof, from the 1st of July 1822, is due from the respondents to the complainants, which will be decreed to be paid into the court of chancery, to be distributed or invested under the authority thereof, according to the rights of the respective complainants.

We concur with the chancellor in awarding costs to the com-

plainants, and are of opinion, as the decree of that court will be entirely reformed, that each party pay their own costs in this court.

BUCHANAN, Ch. J. dissented.

*Decreed*, That the decree of the court of chancery given and rendered in these causes, be reversed, except as to the amount and sum of money, hereby decreed to be payable to the appellees in the first and the appellants in the second of these causes. And this court proceeding to pronounce such decree in the premises, as the court of chancery ought to have pronounced, *Decreed* also, that there is due from the appellants in the first and appellees in the second of these causes, and that they do pay to the appellees in the first and appellants in the second of these causes, in the manner hereinafter mentioned, the sum of $39,318 54, with interest on the sum of $28,576 87, part thereof, from the 1st day of July 1822, the said sum, with interest, having been ascertained by and agreeably to the accounts hereto annexed.

*Decreed* also, that the parties in the said causes, pay their respective costs incurred by them in this court on their appeals, but that the appellants in the first and appellees in the second of these causes, pay to the appellees in the first and the appellants in the second thereof, the costs incurred by the said appellees in the first and appellants in the second of said causes, in the court of chancery.

*Decreed* also, that the chancellor make and pass all necessary orders for carrying this decree into full and complete effect, by ordering and directing, that the said sum of money, with interest as aforesaid, and the costs as aforesaid, incurred in the court of chancery, be brought into the said court of chancery, by the appellants in the first and appellees in the second of these causes, to be distributed and paid, under the directions of the chancellor, to the said appellees in the first and appellants in the second of said causes, according to their respective rights and interests; and also, that the chancellor order and direct, that the said appellees in the first and appellants in the second of said causes, pay to the auditor of the court of chancery the sum of $23 33, allowed by this court to the auditor, for his fees in

auditing and stating the accounts directed by this court to be made between the parties.

*Decreed* also, that all the equity and equitable rights and claim of the said appellees in the first and appellants in the second of said causes, be, and the same is hereby reserved and maintained to them, against the said *Samuel Ringgold* and *Tench Ringgold*, or either of them, as to all or any personal estate, of the late *Thomas Ringgold*, or the proceeds of sales or dispositions thereof, of any kind, and interest on such proceeds, except as to so much of such personal estate and proceeds, as has by the accounts hereto annexed, and by this decree, been applied to or in reference to the payments and disbursements, by the said *Samuel* and *Tench*, or either of them; and also, that the like equity be reserved and maintained to the said appellees in the first and appellants in the second of said causes, against the said *Samuel Ringgold* and *Tench Ringgold*, or each or either of them, as to any legacies bequeathed, to or for the benefit of the said *Thomas Ringgold*, by the last will and testament of his mother, *Mary Ringgold*.

DECREE REVERSED, &c.